774 So.2d 629 (2000)
Milo A. ROSE, Appellant,
v.
STATE of Florida, Appellee.
No. SC95227.
Supreme Court of Florida.
October 12, 2000.
Rehearing Denied December 21, 2000.
*630 Gregory C. Smith, Capital Collateral Counsel, John A. Tomasino, Assistant Capital Collateral Counsel, and Linda McDermott, Assistant Capital Collateral Counsel, Northern Region, Tallahassee, Florida, for Appellant.
Robert A. Butterworth, Attorney General and Carol M. Dittmar, Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
Milo A. Rose, a prisoner under sentence of death, appeals the trial court's denial of his motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

BACKGROUND
Rose was convicted and sentenced to death for the 1982 murder of Robert "Butch" Richardson. We previously summarized the pertinent facts of the crime as follows:
At approximately 10 p.m. on October 18, 1982, several witnesses were talking together outside one of their residences. Testimony at trial revealed that they saw two men walking down the street. Subsequently they heard the sound of breaking glass and saw that one of the men, later identified as Robert C. Richardson, was lying on the ground. The other man, identified by witnesses as Milo Rose, appellant, was standing over him. Evidence shows that appellant then walked to a nearby vacant lot, picked up a concrete block, and returned to the man on the ground. Appellant raised the block over his head and hurled it down on Richardson's head. He picked up the block and hurled it down a total of five or six times. The area where the incident occurred was *631 well lighted, so the witnesses were able to see the man with the concrete block clearly.
Appellant was living with Mrs. Richardson, the victim's mother, at the time. Two other acquaintances were staying with them. On the night of the incident, these two acquaintances left an apartment which was in the vicinity where the killing occurred and found appellant hitchhiking on a nearby street. Appellant got into their truck and stated several times that he had just killed Richardson. Appellant was later found in Mrs. Richardson's house and was arrested.
Rose v. State, 472 So.2d 1155, 1156-57 (Fla.1985) ("Rose I").
Rose was subsequently tried and convicted of first-degree murder. See id. at 1157. The jury recommended the imposition of the death penalty by a vote of nine to three. In accordance with the jury's recommendation, the trial court imposed the death penalty for Richardson's murder after finding that the applicable statutory aggravating[1] circumstances outweighed the nonstatutory mitigating[2] circumstances. See id. This Court affirmed Rose's conviction and death sentence on direct appeal.[3]See id. at 1159.
The trial court summarily denied most of the claims Rose raised in his first motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850,[4] but ordered an evidentiary hearing *632 on the issue of whether Rose's counsel was ineffective during the penalty phase of the trial. See Rose v. State, 617 So.2d 291, 293 (Fla.1993) ("Rose II"), cert. denied, 510 U.S. 903, 114 S.Ct. 279, 126 L.Ed.2d 230 (1993). After conducting an evidentiary hearing, the trial court denied Rose relief and this Court subsequently affirmed the denial. See id. at 298. Rose filed a second motion to vacate judgment and sentence pursuant to rule 3.850 on December 23, 1996.[5] After conducting a Huff[6] hearing, the trial court summarily denied relief and Rose filed the present appeal raising eight claims.[7]
In this appeal, this Court must determine whether the trial court properly denied Rose's successive postconviction motion without an evidentiary hearing. Because the trial court did not hold an evidentiary hearing, this Court must accept Rose's factual allegations as true to the extent they are not refuted by the record. See Gaskin v. State, 737 So.2d 509, 516 (Fla.1999); Valle v. State, 705 So.2d 1331, 1333 (Fla.1997); Lightbourne v. Dugger, 549 So.2d 1364, 1365 (Fla.1989).

BRADY and GIGLIO CLAIMS
Rose contends that the State failed to disclose exculpatory evidence that he could have used to impeach the credibility of two state witnesses, Becky Borton and Mark Poole, in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Additionally, Rose contends that the State violated Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), by intentionally misleading the defense and the jury about the motives of Borton and Poole for testifying against Rose. We address the claims seriatim.
At Rose's 1983 murder trial, both Borton and Pool, neighbors of Rose, testified against him. Borton and Pool testified that they saw Rose hitchhiking near the vicinity of the murder scene on the evening of Richardson's murder and agreed to give Rose a ride home. Borton and Poole testified that during the ride home, Rose *633 had blood on his person and confessed to killing Richardson.
Rose contends that in a case unrelated to Rose's murder case, the State charged Borton and Poole with possession of a misdemeanor amount of marijuana, despite the fact that laboratory analysis demonstrated that they possessed a felony amount of marijuana. According to Rose, the State agreed to charge Borton and Poole with a lesser marijuana possession charge in exchange for their testimony against Rose in his murder trial. Rose claims that this information, which Rose could have used to impeach Borton and Poole, constituted Brady material and that this non-disclosure resulted in prejudice.
In addition, Rose alleges that the State violated Giglio by intentionally misleading the defense regarding Borton and Poole's alleged "deal" with the State. In particular, Rose asserts that during the defense's questioning of Borton at a pretrial deposition pertaining to Rose's murder case, Borton informed defense counsel that she had previously been convicted of possessing marijuana. Thereafter, the assistant state attorney told Rose's attorney: "To prevent any problem later on, why don't you ask if the marijuana charge was a felony or a misdemeanor?" Defense counsel proceeded to ask Borton about the prior marijuana conviction and Borton replied that she had been convicted of a "misdemeanor" marijuana possession offense. Rose argues that the assistant state attorney told his attorney to ask whether the drug offense was a misdemeanor or a felony in an attempt to avoid having Rose's attorney discover the "deal" between the State and Borton. Furthermore, Rose asserts that the State intentionally misled jurors about the motives of Borton and Poole for testifying against Rose by stating in closing argument that no witnesses presented by the State had any more interest in testifying against Rose "than that of a normal citizen."
In response to Rose's allegations, the State argued at the Huff hearing and argues again here on appeal that no such "deal" ever existed between the State and Borton or Poole. Moreover, in light of the other testimony presented at trial, including the testimony of three eyewitnesses to the homicide, the State argued that the outcome of Rose's trial would not have been different had such a "deal" with Borton and Poole existed and been presented to the jury.
In the trial court's order denying relief, the court found:
Defendant claims that the State withheld evidence in violation of Brady v. Md. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), of a relationship between key state witnesses Mark Poole and Becky Borton which was material to their credibility. This claim is based on the arrests of Poole and Borton on September 27, 1982, for possession of misdemeanor amounts of marijuana for which Borton was charged by Information filed October 21, 1982, with possession of a misdemeanor amount of marijuana. The laboratory analysis of the marijuana by FDLE dated October 12, 1982, shows, however, a felony amount of marijuana.... Even assuming for purposes of this nonevidentiary [hearing] that the State gave Ms. Borton the deal of charging her only with the misdemeanor possession for which she was arrested, it would not have affected the outcome of Defendant's trial because Poole and Borton gave the same information to police on the night of the murder, October 18, 1982, as later given in deposition and at trial. During the time frames of the murder, of Poole and Borton giving Defendant the ride home during which he admitted the murder to them, and of Poole and Borton's statements to police, all between 10 p.m. and 12 p.m. on October 18, 1982, Borton had no reason to color her statement or to believe that she needed any deal from the State. Poole and Borton were not among the four eyewitnesses to the crime but testified to Defendant's admissions to them *634 that he had just murdered the victim as they gave him a ride home.
In accordance with Brady, and the United States Supreme Court's subsequent pronouncements in United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), and Kyles v. Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the Court recently enunciated:
There are three components of a true Brady violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued.
Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see Way v. State, 760 So.2d 903, 910 (Fla. 2000).
The trial court in this case focused on the third element of Brady, that is assuming a "deal" existed, whether Rose established the prejudice necessary to satisfy a Brady claim. In order to show prejudice from the State's suppression of evidence, the defendant must establish that "there is a reasonable probability that the result of the trial would have been different if the suppressed [evidence] had been disclosed to the defense." Strickler, 527 U.S. at 289, 119 S.Ct. 1936. "A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682, 105 S.Ct. 3375; see Strickler, 527 U.S. at 281-82, 119 S.Ct. 1936. In determining whether a defendant was prejudiced, the question is not whether the defendant can demonstrate "by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Kyles, 514 U.S. at 434, 115 S.Ct. 1555. Rather, the defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435, 115 S.Ct. 1555.
Rose also asserts that the trial court erred in denying him an evidentiary hearing because it applied the wrong legal standard by analyzing his Brady claim as newly discovered evidence of innocence, using the standard set forth in Jones v. State, 591 So.2d 911 (Fla.1991). The newly discovered evidence standard from Jones imposes a greater burden upon a defendant seeking a new trial than the "materiality" prong of Brady.[8]
We disagree with Rose's assertions and find that in its order denying relief the trial court viewed Rose's allegations in a light most favorable to the defense, properly focused on the materiality of the impeachment evidence, and properly assessed whether confidence in the verdict would be undermined under the Kyles standard. Using the appropriate test, the trial court concluded that the impeachment evidence against Borton and Poole would not have affected the outcome of Rose's trial, nor would it have reasonably put the whole case in such a different light as to undermine the confidence in the verdict. This is the correct legal standard and, accordingly, there was no legal error in the trial court's analysis. See Kyles, 514 U.S. at 434, 115 S.Ct. 1555; Way, 760 So.2d at 915.
Furthermore, we agree with the trial court's analysis of the merits of the Brady claim and, after reviewing the trial record, find that the alleged failure to disclose impeachment evidence does not undermine our confidence in the jury's conviction. Although for purposes of reviewing Rose's Brady claim we must assume that a "deal" had actually taken *635 place between the State and Borton and Poole, we agree with the trial court's assessment that such an arrangement would have had limited impeachment value given the consistency between Borton and Poole's statements on the night of the murder and their testimony at trial.
We do not find that evidence of an alleged "deal" would have put the whole case in a different light so as to undermine confidence in the jury's verdict.[9] In addition to the limited impeachment value of any alleged deal to the testimony of Borton and Poole, three independent witnesses testified that they had observed Rose repeatedly throwing a concrete block onto Richardson's head. These witnesses subsequently identified Rose as the perpetrator of the crime both in a pretrial photographic lineup conducted shortly after the murder and in the courtroom during trial. In light of the overwhelming evidence demonstrating Rose's guilt, we agree with the trial court that even if the State had disclosed evidence of a "deal," Rose has not shown that he was prejudiced pursuant to Brady and Kyles. Accordingly, we affirm the trial court's denial of postconviction relief.
For these same reasons, we also affirm the trial court's denial of Rose's Giglio claim. In order to establish a Giglio violation, a defendant must show that: (1) the prosecutor or witness gave false testimony; (2) the prosecutor knew the testimony was false; and (3) the statement was material. See Robinson v. State, 707 So.2d 688, 693 (Fla.1998); Routly v. State, 590 So.2d 397, 400 (Fla.1991). The standard for determining whether false testimony is "material" under Giglio is the same as the standard for determining whether the State withheld "material" evidence in violation of Brady. See Giglio, 405 U.S. at 154, 92 S.Ct. 763. False testimony is "material" if there is a reasonable likelihood that it could have affected the jury's verdict. See id. Even assuming that Rose's allegations that the State misled both Rose and the jurors about the motives of Borton and Poole for testifying were true, we find that Rose cannot satisfy the "materiality" prong of Giglio because such evidence does not put the case in such a different light as to undermine confidence in the jury's verdict. Therefore, we affirm the trial court's denial of postconviction relief on this issue.[10]

*636 PUBLIC RECORDS REQUEST
Rose also alleges that the trial court violated his constitutional right to have a full and fair state postconviction proceeding by conducting an in-camera inspection of public records to determine whether the State was justified in claiming that such records were exempt from disclosure. On July 11, 1996, Rose filed a public records request with the Pinellas County State Attorney's Office pursuant to chapter 119, Florida Statutes. The State responded and provided Rose with a detailed explanation of the public records that were exempt from disclosure under Florida Rule of Criminal Procedure 3.852. The trial court subsequently conducted an in-camera review of the public records withheld by the State. After conducting the in-camera review, the trial court concluded that the withheld records contained no Brady material, but the court instructed the State in a written order to provide Rose with certain records that were not covered under the statutory exemptions. According to Rose, the trial court's in-camera review of the allegedly exempt public records and its refusal to require the State to turn over handwritten notes pertaining to the alleged "deal" between Borton and Poole and the State prejudiced him. Rose claims that he is entitled to an evidentiary hearing. We disagree.
In Ragsdale v. State, 720 So.2d 203, 206 (Fla.1998), this Court had to determine whether public records were properly exempted from disclosure by the State. This Court ruled that where doubt existed as to whether the State must disclose a particular document, the proper procedure is to have a trial judge conduct an in-camera review of the documents. See id.; see also State v. Kokal, 562 So.2d 324, 327 (Fla. 1990) (stating that when certain statutory exemptions are claimed by the party against whom the public records request has been filed or when doubt exists as to whether a particular document must be disclosed, the proper procedure is to furnish the document to the trial judge for an in-camera inspection). After conducting an in-camera review, the State must turn over the nonexempt materials to the defense. See Ragsdale, 720 So.2d at 206.
In this case, Judge Schaeffer conducted an in-camera proceeding and examined each of the alleged documents that the State withheld to determine whether the documents were properly withheld. After reviewing the documents, the trial court issued a written order instructing the State as to which documents it needed to produce to the defense.[11] Rose has failed to cite to any authority that suggests that Judge Schaeffer's review of the withheld documents was improper and we have found no authority that supports this view. Therefore, we find that Judge Schaeffer fully complied with procedures set forth in *637 Ragsdale and Kokal for determining whether the State's claimed exemptions were proper.

CONCLUSION
The remainder of Rose's claims are either procedurally barred or without merit.[12] For the reasons expressed above, we affirm the denial of postconviction relief.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE and LEWIS, JJ., concur.
QUINCE, J., recused.
NOTES
[1] The trial court found the following aggravating circumstances: (1) the capital felony was committed while Rose was under sentence of imprisonment; (2) Rose was previously convicted of felonies involving the use or threat of violence; and (3) the murder was committed in a cold, calculated, and premeditated manner. See Rose I, 472 So.2d at 1157.
[2] The trial court considered evidence and testimony that Rose had been drinking prior to the murder, had a history of alcohol abuse, suffered from antisocial personality disorder, and was a "good person." Id.
[3] On direct appeal, Rose raised seven claims: (1) the trial court erred by admitting evidence of an impermissibly suggestive pretrial identification and by allowing an identification in court that was tainted by the pretrial identification; (2) the trial court erred by restricting cross-examination of an investigating police detective on matters affecting the detective's credibility; (3) the trial court erred by admitting testimony of the State's witness, Michael Craft, without conducting a proper inquiry upon defense counsel's objection to a discovery violation; (4) the trial court erred by admitting evidence of nonstatutory aggravating circumstances, including prior offenses for which Rose had not been convicted, and a pending allegation of a parole violation; (5) the trial court erred by denying Rose's request to retake the witness stand to clarify and supplement his testimony prior to closing arguments; (6) the trial court erred by failing to consider evidence of mitigating circumstances including Rose's potential for rehabilitation, his family background, and his relationship with the deceased victim; and (7) the trial court erred by instructing the jury upon and finding as an aggravating circumstance that the murder was cold, calculated, and premeditated because the evidence was legally insufficient to establish that circumstance. See Rose I, 472 So.2d at 1155-59. This Court held that Rose's claims lacked merit and that the trial court properly imposed the death penalty. See id.
[4] In his first 3.850 motion, Rose claimed that: (1) trial counsel rendered ineffective assistance of counsel in the guilt phase of trial by: (a) failing to challenge evidence regarding blood found on Rose; (b) failing to point out inconsistencies in the eyewitness testimony and failing to obtain an expert witness in eyewitness identification; (c) failing to object when the prosecutor in closing argument misrepresented the testimony of four eyewitnesses; and (d) failing to object when the prosecutor told the jury that there was evidence that jurors did not hear that would be disclosed to the judge in a presentence investigation report; (2) trial counsel rendered ineffective assistance in the penalty phase by failing to prepare and present mitigating evidence; (3) the court-appointed psychologist conducted an inadequate psychological evaluation, thereby depriving Rose of mitigating evidence; (4) Rose's right to be present at a critical stage of the proceeding was violated when the trial judge held an in-camera discussion with Rose's trial counsel concerning counsel's representation of Rose; (5) Rose's death sentence was disproportionate based on the facts in the case; (6) the sentencing jury and judge were erroneously allowed to consider nonstatutory aggravating circumstances; and (7) the jury instructions improperly instructed the jury on its role in determining whether aggravating circumstances were applicable and in recommending a sentence for the defendant. This Court held that: (1) Rose's attorney was not ineffective in his representation of Rose, see Rose v. State, 617 So.2d 291, 294-95 (Fla.1993) ("Rose II"); (2) the court-appointed psychologist conducted an adequate psychological evaluation, see id. at 295; (3) the in-camera discussion between the trial judge and Rose's attorney did not affect the fairness of the proceedings against Rose, see id. at 296; (4) Rose's claims that the his death sentence was disproportionate and that the sentencing jury and judge were erroneously allowed to consider nonstatutory aggravating circumstances were previously rejected on direct appeal, see id. at 297; and (5) the jury instructions correctly informed the jury of its sentencing role. See id.
[5] Rose filed an amended motion to vacate judgment of conviction and sentence on September 4, 1998.
[6] Huff v. State, 495 So.2d 145 (Fla.1986).
[7] Rose's claims on appeal are: (1) The State withheld impeachment evidence concerning two state witnesses, Mark Poole and Becky Borton, in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) the State purposely misled the jury about the motives of Borton and Poole for testifying, in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); (3) defense counsel was ineffective under the standards of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for failing to discover this impeachment evidence against Borton and Poole and for failing to present this evidence to the jury; (4) the State violated Rose's constitutional rights by improperly withholding requested public records; (5) the trial court erred by granting the State's motion to strike Rose's pro se motion for reconsideration; (6) Rose has been denied the right to effective representation because Capital Collateral Regional Counsel ("CCRC") lacks the necessary funding to fully investigate and prepare Rose's postconviction pleadings; (7) Florida's use of electrocution as its method of execution is unconstitutional; (8) the State failed to afford Rose a clemency review process that comports with due process; and (9) the Florida Bar Rule of Professional Conduct forbidding attorneys from interviewing jurors violates Rose's constitutional rights.
[8] Compare Jones v. State, 709 So.2d 512, 521 (Fla.1998) ("[T]he newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial."), with Way v. State, 760 So.2d 903, 913 (Fla.2000) (stating that under Brady, "the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict").
[9] Both Borton and Poole were arrested for violating section 893.13(6)(b), Florida Statutes (Supp.1982), by possessing a misdemeanor amount of marijuana, less than twenty grams, on September 28, 1982. Richardson's murder did not occur until the evening of October 18, 1982. Hours after the murder, the police questioned Borton and Poole about the Richardson homicide. During that conversation, Borton and Poole informed authorities that Rose admitted to killing Richardson. According to the trial court, at the time Borton and Poole provided their statements to the police in which they implicated Rose as the perpetrator of Richardson's murder, Borton and Poole had no reason to color their statements or believe that they needed a "deal" from the State for reduced charges. At that time, Borton and Poole had only been charged with a misdemeanor. Thus, any "deal" offered by the State to secure the testimony of Borton and Poole would have had to be formulated after the witnesses had already provided authorities with information incriminating Rose in the murder.
[10] Having rejected Rose's Brady and Giglio claims on the grounds that Rose failed to establish prejudice, we do not address the merits of his corresponding ineffective assistance of counsel claim pertaining to his attorney's failure to discover this impeachment evidence against Borton and Poole and to present this evidence to the jury. Even if Rose's trial counsel's performance was deficient because he should have discovered this impeachment evidence, Rose's ineffective assistance of counsel claim is without merit because Rose would not be able to satisfy the prejudice prong of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See Downs v. State, 740 So.2d 506, 513 n. 10 (Fla.1999); Mills v. State, 684 So.2d 801, 804 n. 4 (Fla.1996).

We also reject Rose's assertion that the cumulative effect of his Brady and Giglio claims and the ineffective assistance of counsel claim he raised in his initial rule 3.850 motion warrant a new trial. After conducting a cumulative error analysis, we do not find that our conclusion as to prejudice would change. Cf. Way, 760 So.2d at 915; Lightbourne, 742 So.2d at 249. In Downs, 740 So.2d at 509 n. 5, we held that claims of cumulative error are properly denied where the Court has considered each individual claim and found the claims to be without merit. Upon review of Rose's initial rule 3.850 motion, we determined that the trial record conclusively refuted Rose's claim that his attorney provided ineffective assistance of counsel in the guilt and penalty phases of trial. See Rose II, 617 So.2d at 293-98. Having found that each claim lacks merit, we find no cumulative error.
[11] Judge Schaeffer, by written order dated September 27, 1997, ordered that the State provide Rose with: (1) all arrest records of Richard Rhodes, Milo Rose, Rebecca Borton, and Mark Poole; (2) all documents that contained the addresses of Borton and Poole; (3) all documents in the case of Richard Rhodes and documents excising the name and address of Richard Nieradka and his relatives and wife, Sandra; (4) the Department of Corrections medical records of Richard Rhodes; (5) the portions of an audio tape and transcript in the State's case against Richard Rhodes; (6) a one-page research memo from the State Attorney's Office regarding the case of Milo Rose; (7) information regarding the identity of the alleged victims of Richard Rhodes; and (8) Clearwater Police Department records. Aside from ordering that the State turn these specific materials over to the defense, Judge Schaeffer concluded that there was no Brady material found within the withheld records.
[12] Claim (5) regarding the trial court's striking of Rose's pro se motion for reconsideration is without merit. At the time Rose filed the pro se motion, he was represented by counsel whom he had not sought to discharge. The trial court did not abuse its discretion in striking the motion. See Jackson v. State, 767 So.2d 1156, 1159 (Fla.2000); State v. Tait, 387 So.2d 338, 340 (1980). We find that claim (6) regarding inadequate funding of CCR is without merit and is further improperly brought as a successive claim. See Remeta v. State, 710 So.2d 543, 546 (Fla. 1998); see also Arvelaez v. Butterworth, 738 So.2d 326, 326 (Fla.1999). Moreover, Rose has not alleged how he was prejudiced by the inadequate funding. Likewise, we find that claim (7) regarding electrocution is without merit. See § 922.10, Fla. Stat. (1999), amended by ch.2000-02, § 1, Laws of Fla. ("A death sentence shall be executed by electrocution or lethal injection...."); Bryan v. State, 753 So.2d 1244, 1253 (Fla.2000) (holding that Florida's current statutory scheme that provides defendants with a choice of either electrocution or lethal injection as the method of execution is constitutional and could be retroactively applied to criminal defendants sentenced prior to the statute's enactment). In claim (8), Rose alleges constitutional deficiencies in the clemency review process. As we have done previously, we reject this claim as without merit. See, e.g., Sullivan v. Askew, 348 So.2d 312, 316 (Fla.1977). Claim (9) attacking the constitutionality of the Florida Bar Rule of Professional Conduct governing interviews of jurors is procedurally barred because Rose could have raised this issue on direct appeal. See Young v. State, 739 So.2d 553, 555 (Fla.1999); Gaskin v. State, 737 So.2d 509, 512 n. 5, 513 n. 6 (Fla.1999); Ragsdale, 720 So.2d at 204.