868 So.2d 498 (2003)
James GUZMAN, Appellant,
v.
STATE of Florida, Appellee.
James Guzman, Petitioner,
v.
State of Florida, Respondent.
Nos. SC02-860, SC02-2131.
Supreme Court of Florida.
November 20, 2003.
Rehearing Denied March 4, 2004.
*501 Eric Pinkard, Assistant CCRC, and James L. Driscoll, Jr., Assistant CCRC, Office of the Capital Collateral Regional CounselMiddle Region, Tampa, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, and Kenneth S. Nunnelley, Senior Assistant Attorney General, Daytona Beach, FL, for Appellee/Respondent.
PER CURIAM.
James Guzman appeals an order of the circuit court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. Guzman also files a petition for a writ of habeas corpus. We have jurisdiction under article V, section 3(b)(1) and (9) of the Florida Constitution. For the following reasons, we affirm the circuit court's order as to most of the issues presented in Guzman's rule 3.850 motion, but we remand this case to the circuit court for a ruling on Guzman's Giglio[1] claim as discussed below. We deny Guzman's petition for a writ of habeas corpus.

BACKGROUND
On August 12, 1991, David Colvin's body was found lying face down on the bed in the motel room where he lived. Colvin had been stabbed nineteen times. A samurai sword that belonged to Colvin was propped up in a light fixture above his bed; however, no blood or fingerprints were found on the samurai sword. The medical examiner determined that Colvin died between 3 p.m. and midnight on August 10.
After Colvin's body was found, police officers interviewed other residents of the motel where Colvin had lived. About a week before the murder, Guzman and Martha Cronin, a prostitute and a crack cocaine addict, had begun living together at the motel. The police interviewed both Guzman and Cronin. Each denied having any information about Colvin's murder. On August 16, 1991, the State published in two local newspapers a reward offer of $500 for information about the case.
The police investigation failed to lead to an arrest until November 23, 1991, when Cronin was arrested on prostitution charges. Cronin volunteered to testify about Colvin's murder in exchange for a deal in her own case. Cronin then told the police that Guzman had confessed to her that he killed Colvin. The police took Cronin to a motel and paid for her room. Cronin used the room for prostitution and used crack cocaine; then she left the motel. The police later rearrested Cronin. On January 3, 1992, the police paid Cronin $500 by money order delivered to the Volusia County jail. The police detective *502 who arranged the payment could not recall when she first discussed the reward money with Cronin.
Guzman was arrested on December 13, 1991. In January 1992, a grand jury indicted Guzman for the armed robbery and murder of David Colvin. Following a jury trial in September 1992, Guzman was convicted as charged and sentenced to death. On direct appeal, this Court reversed and remanded for a new trial, holding that Guzman's right to a fair trial was violated because his public defender had a conflict of interest in representing both Guzman and a witness against Guzman. Guzman v. State, 644 So.2d 996, 1000 (Fla.1994).
On retrial in December 1996, Guzman waived his right to a jury in both the guilt and penalty phases. The waiver was at the instance of Guzman and was contrary to the advice of his counsel. Guzman signed a written waiver. Both the trial court and Guzman's counsel questioned Guzman to ensure that Guzman's waiver was knowing, voluntary, and intelligent.
At trial, the medical examiner testified that the weapon used to kill Colvin was a single-edged knife or knife-like object with a slightly curved, heavy blade. The medical examiner could not identify the murder weapon used, but he said that Colvin's samurai sword could have inflicted some of Colvin's wounds and that a survival knife like one owned by Guzman[2] could have inflicted other wounds.
Guzman's fingerprints were on the telephone in Colvin's room. There were blood stains on other parts of the phone, but Guzman's fingerprints on the phone were not bloody. Blood and saliva samples were taken from Guzman, but nothing was matched to anything found in Colvin's room. No other physical evidence connected Guzman to the murder.
Guzman testified at trial that on the day before the murder, Guzman helped Colvin move from one room to another in the motel. Guzman said that he used the phone in Colvin's room at that time and again on the morning of August 10. Cronin confirmed that Guzman telephoned her from Colvin's room.
On the morning of August 10, Guzman and Colvin left the motel in Colvin's car. They drank beer at a bar, then went to the International House of Pancakes to eat breakfast. Guzman testified that he and Colvin returned to the motel at about noon. Guzman said that he gave Colvin's car and room keys back to Colvin and returned to his own room, where Cronin was getting ready to go to work as a prostitute. Cronin left the room at around noon.
Guzman testified that at about 3 p.m., Cronin returned to the room accompanied by Curtis Wallace. Guzman said that Wallace gave him a diamond ring, asking Guzman to trade the ring for crack cocaine. It is undisputed that on August 10, at around 4 p.m. or 5 p.m., Guzman took the ring, which had belonged to Colvin, to a drug dealer named Leroy Gadson. Guzman sold the ring to Gadson for drugs and cash. Guzman testified that he then returned to the room and gave Wallace some of the drugs.
Cronin's testimony at trial contradicted Guzman's. Cronin said that on the morning of August 10 Guzman told her that he was going to drive Colvin to the bank. Cronin stated that Guzman returned to their room at about 11 a.m. and showed her Colvin's car keys and room keys, saying *503 he was going to help Colvin move to another room in the motel. Cronin said she left the room at about 11 a.m. to work as a prostitute, and returned at about 2:30 p.m. She said that at about 3 p.m. Guzman came back to their room, looking upset and carrying a garbage bag that contained white rags. Cronin said that Guzman told her he killed Colvin. She said Guzman told her that Colvin woke up while Guzman was in the process of robbing him, so Guzman hit Colvin in the head and then stabbed him with the samurai sword. Cronin said that Guzman showed her a ring and some cash he had taken from Colvin. Cronin identified the ring at trial. Cronin said that Guzman told her before the murder that Colvin would be easy to rob because he was always drunk and usually had money. Cronin testified that Guzman had said in a separate conversation that if he ever robbed anyone he would kill them, and that Guzman was holding his survival knife when he said this.
Cronin said that when she was arrested for prostitution in November 1991, she offered to tell the arresting officers who killed Colvin. However, Cronin denied that she received any deal for her testimony against Guzman. She said she was taken to a motel room for protection, but that she used the room for prostitution and continued to use crack cocaine, so she got no deal from the State. The detective who paid the $500 to Cronin also testified at trial, stating that Cronin received no deal for her testimony against Guzman.
Guzman's counsel attempted to impeach Cronin by bringing out that she was a prostitute and a drug addict, that she testified against Guzman while she faced charges of prostitution, and that she was angry at Guzman because he was involved with other women. Guzman's counsel also presented the testimony of Carmelo Garcia, who said Cronin told him in February of 1992 that Guzman had not killed anyone and that Cronin admitted she had lied to the police because she had been arrested.
Paul Rogers, a jailhouse informant, corroborated Cronin's testimony against Guzman. Rogers and Guzman shared a jail cell during the spring of 1992. At trial, Rogers testified that Guzman said that he robbed and killed Colvin. Rogers testified that Guzman told him that he used Colvin's key to enter Colvin's room, and that Colvin woke up while Guzman was robbing him. Rogers said that Guzman told him that he hit Colvin in the head with a samurai sword and stabbed him ten or eleven times. Rogers said Guzman confessed that he took Colvin's ring and some cash, cleaned up the sword, and put everything in the dumpster.
Guzman's counsel attempted to impeach Rogers by asking if Rogers had read Guzman's trial papers, which Guzman kept in the cell they shared, but Rogers denied reading Guzman's papers. Rogers also denied learning of the case by reading the newspaper. Rogers admitted that after he initially told police that Guzman confessed to him, Rogers had signed an affidavit saying he knew nothing about Colvin's murder and indicating that he would not testify against Guzman.
Following the presentation of this evidence at a bench trial, the trial court convicted Guzman of armed robbery and firstdegree murder, and imposed the death penalty. In its sentencing order, the court found five aggravating factors, including that the murder was committed in a cold, calculated, and premeditated manner (CCP).[3] The court found no statutory mitigating *504 factors. As nonstatutory mitigation, the court found that Guzman's alcohol and drug dependency was entitled to little weight.
On direct appeal from his second trial, Guzman raised eight issues.[4] This Court held that the evidence did not support the CCP aggravator, but affirmed Guzman's convictions and death sentence. Guzman v. State, 721 So.2d 1155 (Fla.1998). The United States Supreme Court denied certiorari. Guzman v. Florida, 526 U.S. 1102, 119 S.Ct. 1583, 143 L.Ed.2d 677 (1999).
Guzman filed a rule 3.850 motion for postconviction relief on March 27, 2000, and an amended motion on November 30, 2000, raising eleven claims.[5] During the pendency of his 3.850 motion, Guzman filed a motion for DNA testing of a clump of hair recovered from the back of Colvin's thigh at the murder scene.[6] The State filed a response stating that the hair evidence had been destroyed in November 1992. Guzman amended his 3.850 motion to add three claims related to the destruction of the hair evidence.[7] The postconviction court, which was the same court that convicted and sentenced Guzman, held an evidentiary hearing on Guzman's 3.850 motion and denied relief. Guzman appeals the postconviction court's denial of his rule 3.850 motion, and contemporaneously petitions this Court for a writ of habeas corpus.

RULE 3.850 APPEAL
Guzman asserts that the circuit court erred in denying four claims: (1) the State committed a Giglio violation by permitting false testimony at trial denying that State *505 witness Martha Cronin was paid for her testimony against Guzman; (2) the State committed a Brady violation by failing to disclose to the defense the State's $500 payment to Cronin; (3) the State destroyed potentially exculpatory DNA evidencea clump of hair from the crime scenein bad faith; and (4) Guzman was denied a fair trial due to the prosecutor's presenting misleading evidence and improper argument. With respect to Guzman's Giglio claim, we clarify the appropriate standard and remand for the trial court to apply the law to the facts. We deny Guzman relief on his remaining claims.

I. Giglio Claim
In his first claim, Guzman asserts that Martha Cronin and the lead detective on Colvin's murder case both testified falsely at trial, violating Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). To establish a Giglio violation, it must be shown that: (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material. Ventura v. State, 794 So.2d 553, 562 (Fla.2001); see also Rose v. State, 774 So.2d 629, 635 (Fla.2000).
The first two prongs of the Giglio test are satisfied in this case. Both Cronin and the lead detective on the case testified falsely at trial that Cronin received no benefit for her testimony against Guzman other than being taken to a motel rather than jail when she was arrested. In fact, the State paid Cronin $500, a significant sum to an admitted crack cocaine addict and prostitute. The knowledge prong is satisfied because the knowledge of the detective who paid the reward money to Cronin is imputed to the prosecutor who tried the case. See Gorham v. State, 597 So.2d 782, 784 (Fla.1992) (holding that the prosecutor is charged with constructive knowledge of evidence withheld by other state agents, such as law enforcement officers).
The only disputed issue with respect to Guzman's Giglio claim is the third prong, which requires a finding that the false testimony presented at trial was material. See Ventura, 794 So.2d at 562. Guzman asserts that the postconviction court applied the wrong standard in deciding the materiality prong of his Giglio claim. In its order denying Guzman's rule 3.850 motion, the postconviction court articulated the Giglio standard of materiality as:
Under Giglio, a statement is material if "there is a reasonable probability that the false evidence may have affected the judgment of the jury." [Ventura v. State, 794 So.2d 553, 563 (Fla.2001)] (quoting Routly [v. State], 590 So.2d [397, 400 (Fla.1991).]) "In analyzing this issue ... courts must focus on whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. (quoting White v. State, 729 So.2d 909, 913 (Fla.1999)).
Order Denying Claims IIC(1), IIE(1), IIE(4), etc. at 12. After evaluating the State's $500 payment to Cronin in light of the other evidence presented at trial, the postconviction court concluded that "there is not a reasonable probability that the false evidence would put the whole case in such a different light as to undermine confidence in the verdict." Id. at 13.
The postconviction court stated and applied the Giglio standard of materiality from our decisions in Ventura v. State, 794 So.2d 553 (Fla.2001), White v. State, 729 So.2d 909, 913 (Fla.1999), and Routly v. State, 590 So.2d 397 (Fla.1991). Having reviewed these decisions, as well as our other Giglio and Brady decisions, we conclude that our precedent in this area has *506 lacked clarity, resulting in some confusion and improper merging of the Giglio and Brady materiality standards.[8] For example, in Rose v. State, 774 So.2d 629, 635 (Fla.2000), we said: "The standard for determining whether false testimony is `material' under Giglio is the same as the standard for determining whether the State withheld `material' in violation of Brady." In reliance on Rose, the trial court's order that we approved in Trepal erroneously stated that in addressing a Giglio claim "[t]he materiality prong is the same as that used in Brady." Trepal v. State, 846 So.2d 405, 425 (Fla.2003). We recede from Rose and Trepal to the extent they stand for the incorrect legal principle that the "materiality" prongs of Brady and Giglio are the same. We now clarify the two standards and the important distinction between them.
The Brady standard of materiality applies where the prosecutor fails to disclose favorable evidence to the defense. See Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under Brady, the undisclosed evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).[9] A criminal defendant alleging a Brady violation bears the burden to show prejudice, i.e., to show a reasonable probability that the undisclosed evidence would have produced a different verdict. Strickler v. Greene, 527 U.S. 263, 281 n. 20, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).
By contrast to an allegation of suppression of evidence under Brady, a Giglio claim is based on the prosecutor's knowing presentation at trial of false testimony against the defendant. See Giglio, 405 U.S. at 154-55, 92 S.Ct. 763. Under Giglio, where the prosecutor knowingly uses perjured testimony, or fails to correct what the prosecutor later learns is false testimony, the false evidence is material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Justice Blackmun observed in Bagley that the test "may as easily be stated as a materiality standard under which the fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt." 473 U.S. at 679-80, 105 S.Ct. 3375. The State, as the beneficiary of the Giglio violation, bears the burden to prove that the presentation of false testimony at trial was harmless beyond a reasonable doubt. Id. at 680 n. 9, 105 S.Ct. 3375 (stating that "this Court's precedents indicate that the standard of *507 review applicable to the knowing use of perjured testimony is equivalent to the Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)] harmlesserror standard").[10]
Thus, while materiality is a component of both a Giglio and a Brady claim, the Giglio standard of materiality is more defense friendly.[11] The Giglio standard reflects a heightened judicial concern, and correspondingly heightened judicial scrutiny, where perjured testimony is used to convict a defendant. See Bagley, 473 U.S. at 682, 105 S.Ct. 3375 (explaining that the defense-friendly standard of materiality is justified because the knowing use of perjured testimony involves prosecutorial misconduct and "a corruption of the truthseeking function of the trial process") (citing Agurs, 427 U.S. at 104, 96 S.Ct. 2392). Under Giglio, once a defendant has established that the prosecutor knowingly presented false testimony at trial, the State bears the burden to show that the false evidence was not material.
In Guzman's case, the postconviction court's resolution of the Giglio claim does not sufficiently reflect the standard appropriate to a Giglio claim. In its order, the court did not state that there was no reasonable likelihood that the false evidence regarding the $500 payment to Cronin could have affected the court's judgment as factfinder. Nor did the court find that the State had demonstrated that the false evidence was harmless beyond a reasonable doubt. Because of this lack of findings critical to a Giglio analysis, we cannot determine that the court adequately distinguished the Giglio standard from the Brady standard when considering and ultimately deciding the Giglio claim.[12] We therefore remand this claim to the trial court for reconsideration and for clarification of its ruling on the materiality prong of Guzman's Giglio claim. To reiterate, the proper question under Giglio is whether there is any reasonable likelihood that the false testimony could have affected the court's judgment as the factfinder in this *508 case. If there is any reasonable likelihood that the false testimony could have affected the judgment, a new trial is required. The State bears the burden of proving that the presentation of the false testimony was harmless beyond a reasonable doubt.

II. Brady Claim
Next, Guzman claims that the State committed a Brady violation by failing to disclose that Martha Cronin received a $500 reward for her testimony against Guzman. Brady requires the State to disclose material information within the State's possession or control that tends to negate the guilt of the defendant. To establish a Brady violation, a defendant must show: (1) evidence favorable to the accused, because it is either exculpatory or impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that prejudice ensued. Jennings v. State, 782 So.2d 853, 856 (Fla.2001).
The first prong of Brady is satisfied in this case because the reward to Cronin was potentially favorable evidence to Guzman as impeachment evidence against Cronin. The second prong is satisfied because Guzman filed a specific discovery demand requesting from the State all agreements or any consideration given to a State witness, and the State's written response stated that Cronin received no "agreements, assurances of nonprosecution or leniency, offers, benefits or understandings."
The test for prejudice or materiality under Brady is whether, had the evidence been disclosed, there is a reasonable probability of a different result, expressed as a probability sufficient to undermine confidence in the outcome of the proceedings. See Cardona v. State, 826 So.2d 968, 973 (Fla.2002). We review de novo the postconviction court's determination that the suppressed evidence was not material under Brady. Way v. State, 760 So.2d 903, 913 (Fla.2000).
Having reviewed the record, we conclude that there is no reasonable probability that, had the reward evidence been disclosed, the outcome of the trial would have been different. During cross-examination at trial, Guzman's counsel presented significant impeachment evidence against Cronin: her addiction to crack cocaine; her multiple arrests for prostitution; her attempt to make a deal with the State when she was arrested, in exchange for her testimony against Guzman; her initial claim to know nothing about Colvin's murder; and her jealousy of Guzman's relationships with other women. Guzman also presented the testimony of Carmelo Garcia, who said that Cronin told him she had lied to the police about Guzman committing the murder. In light of the significant impeachment evidence presented at trial, evidence of the State's reward to Cronin would have been merely cumulative. Further, the record contains other evidence of Guzman's guilt apart from Cronin's testimony. Paul Rogers, the jailhouse informant who shared a cell with Guzman, corroborated Cronin's testimony. It is undisputed that Guzman possessed Colvin's ring and traded it for drugs and cash. Finally, the medical examiner testified at trial that Colvin's sword and Guzman's survival knife were consistent with the murder weapon. In light of this evidence of Guzman's guilt, and in light of the significant impeachment of Cronin apart from her receipt of the $500 reward, we conclude that there was not a reasonable probability that had the information regarding the reward been disclosed to Guzman, the result of the proceeding would have been different. The reward evidence fails to put the whole case in such a different light as to undermine confidence in the *509 verdict. Guzman is not entitled to relief on his Brady claim.

III. Claim of Bad Faith Destruction of Evidence
Guzman next argues that he was deprived of due process by the State's bad faith destruction of a clump of hair found on the back of Colvin's thigh at the murder scene. Guzman asserts that the hair was potentially exculpatory evidence because, if DNA testing showed that the hair was not Guzman's or Colvin's, this would show that someone other than Guzman killed Colvin. Guzman argues that the State's bad faith is established by the destruction of evidence without a written request or court order, in violation of the Daytona Beach Police Department's rules and procedures, particularly in light of the fact that the hair evidence was destroyed by an officer who was subsequently convicted of stealing items from the evidence room. As alternatives to a bad faith claim based on these facts, Guzman asserts that the State committed a Brady violation by failing to disclose the destruction of the hair evidence, and that Guzman's trial counsel was ineffective in failing to ascertain that the hair evidence was destroyed.
The loss or destruction of evidence that is potentially useful to the defense violates due process only if the defendant can show bad faith on the part of the police or prosecution. See Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). Under Youngblood, bad faith exists only when police intentionally destroy evidence they believe would exonerate a defendant. Youngblood explained that the "presence or absence of bad faith ... must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Id. at 57 n. *, 109 S.Ct. 333. Evidence that has not been examined or tested by government agents does not have "apparent exculpatory value" and thus cannot form the basis of a claim of bad faith destruction of evidence. See id. at 57, 109 S.Ct. 333 (rejecting a due process claim based on the government's failure to preserve evidence "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant"); see also King v. State, 808 So.2d 1237, 1242 (Fla.2002) (holding that a defendant failed to show bad faith on the part of the State in destroying hair and tissue evidence, in part because the defendant failed to show the police made a "conscious effort to prevent the defense from securing the evidence"); Merck v. State, 664 So.2d 939, 942 (Fla.1995) (holding that the defendant failed to show bad faith in a police detective's failure to preserve a pair of pants found at a crime scene, because the detective believed they did not have evidentiary value).
Guzman argues that bad faith exists because the police destroyed the hair evidence in violation of established practices and procedures. However, under Youngblood and this Court's precedent, the determination of bad faith does not turn on whether law enforcement officers followed established procedures. Instead, bad faith exists only when law enforcement officers intentionally destroy evidence they believe would exonerate a defendant. See Youngblood, 488 U.S. at 57, 109 S.Ct. 333. Guzman has not shown that the hair sample from the murder scene would exonerate him, or that police officers ever believed it might. To the contrary, the evidence shows that police officers believed the hair evidence was irrelevant to solving the case. The lead detective testified at the rule 3.850 hearing that she believed the clump of hair was the victim's since the victim's skull had been cut multiple times, the *510 clump of hair appeared to have been cut, the hair was bloody, and the clump of hair matched the victim's hair color. The detective stated that she believed the hair sample was not significant to the case.
Thus, as in Merck, the police officers in this case believed that the destroyed evidence had no evidentiary value. Guzman has not shown that any State actor intentionally deprived him of evidence which the State actor believed to be exculpatory. Guzman asserts that if the hair sample had been tested, the result of the test might have exonerated him; however, the destruction of evidence that, if tested, might have exonerated Guzman is not sufficient under Youngblood to establish a due process violation. Guzman's claim of bad faith destruction of evidence must fail.
Likewise, there is no merit in Guzman's claim that the State committed a Brady violation by failing to disclose that the hair evidence had been destroyed. The first requisite element of a Brady violation is evidence favorable to the accused. Jennings v. State, 782 So.2d 853, 856 (Fla. 2001). Guzman has not shown that the hair was evidence favorable to him. As discussed above, contrary to Guzman's argument, the destruction of the hair evidence would not have enabled him to obtain a dismissal under Youngblood. Thus, Guzman fails to establish the first requisite element of a Brady violation.
Similarly, Guzman has failed to show ineffective assistance of counsel based on his counsel's failure to discover the destruction of the hair evidence. To establish a claim of ineffective assistance of counsel, a defendant must establish deficient performance and prejudice. See Rutherford v. State, 727 So.2d 216, 218 (Fla.1998) (citing Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). We do not reach the prejudice prong of a Strickland analysis because we find that Guzman's counsel was not deficient in failing to pursue the hair evidence so as to discover its destruction before trial. Guzman's trial counsel testified at the rule 3.850 hearing that he thought the clump of hair was the victim's, based on the wounds to the victim's skull, the force of the blows and blood spatter indicating that hair could have been dislodged, and the fact that the hair was bloody. This was a reasonable conclusion; as stated above, it was the same conclusion reached by the lead detective on the case. Because Guzman's counsel reasonably discounted the evidentiary value of the hair sample, counsel was not constitutionally ineffective with regard to this issue.

IV. Prosecutorial Misconduct Claim
In his final rule 3.850 claim, Guzman asserts that the prosecutor engaged in misconduct at trial by eliciting testimony about Martha Cronin's polygraph examination and about Guzman's collateral crime of drug possession. At trial, Guzman objected to the prosecutor's attempts to introduce this evidence, and the trial court ruled that the evidence should be excluded. Guzman does not assert error in the trial court's evidentiary rulings, but he claims that the trial proceeding was tainted by the prosecutor's references to inadmissible evidence, because these references placed inflammatory and prejudicial evidence before the factfinder.
These claims are procedurally barred as they could have and should have been raised on direct appeal. See Brown v. State, 755 So.2d 616, 621 (Fla.2000). If considered on the merits, these claims fail because Guzman's trial was a nonjury trial, and the judge as finder of fact is presumed to have disregarded any inadmissible evidence or improper argument. See First Atlantic Nat'l Bank of Daytona Beach v. *511 Cobbett, 82 So.2d 870, 871 (Fla.1955) (stating that a judge trying a case without a jury "is in a position to evaluate the testimony and discard that which is improper or which has little or no evidentiary value"). Even where a judge erroneously admits improper evidence, the judge as factfinder is presumed to disregard it. See, e.g., State v. Arroyo, 422 So.2d 50, 51 (Fla. 3d DCA 1982). Here, the judge did not err, but appropriately excluded inadmissible evidence. Given these evidentiary rulings, the judge a fortiori may be presumed to have disregarded the inadmissible evidence. Therefore, assuming arguendo that the prosecutor's attempts to introduce the evidence were improper, the attempts were harmless.

PETITION FOR WRIT OF HABEAS CORPUS
In his petition for a writ of habeas corpus, Guzman raises two claims: (1) his waiver of a jury for the penalty phase of his trial was invalid in light of Ring[13] and Apprendi[14]; (2) he may be incompetent to be executed.

I. Claim of Invalid Waiver of Jury Trial
Guzman claims that his waiver of a jury for the penalty phase of his trial was invalid. A defendant's waiver of a jury trial is valid only if the waiver is knowing, intelligent, and voluntary. Tucker v. State, 559 So.2d 218, 219 (Fla.1990) (citing Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)). Guzman asserts that he did not knowingly waive his jury rights, because at the time of his waiver in 1996, neither the trial court nor defense counsel knew the rights that would be granted by Ring and Apprendi, so they did not explain these rights to Guzman. This claim lacks merit because Ring and Apprendi did not invalidate any aspect of Florida's death sentencing scheme. See Bottoson v. Moore, 833 So.2d 693, 695 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002). Thus, Ring did not expand Guzman's jury rights beyond what he knew when he waived those rights. This claim is denied.

II. Claim of Incompetence to be Executed
Guzman's second habeas claim is that he may be incompetent to be executed. He concedes that the claim is premature under Florida Rules of Criminal Procedure 3.811 and 3.812. Guzman asserts that he makes this argument to preserve his ability to pursue a similar claim in the federal system. We agree with Guzman's concession that this issue is not yet ripe, and we therefore find it to be without merit.

CONCLUSION
For the reasons stated above, we remand Guzman's Giglio claim to the postconviction court for application of the Giglio standard to the facts. In all other respects, we affirm the court's order denying Guzman's rule 3.850 motion. We commend the postconviction court for its thorough and well-reasoned order, which facilitated our review. We deny Guzman's petition for a writ of habeas corpus.
It is so ordered.
ANSTEAD, C.J., and WELLS, PARIENTE, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
[2] At the time of Guzman's arrest for Colvin's murder on December 13, 1991, Guzman had a survival knife in his possession.
[3] The five aggravating factors found by the trial court were: (1) Guzman was previously convicted of a violent felony; (2) the murder was committed in the course of a robbery; (3) the murder was committed for the purpose of avoiding arrest; (4) the murder was committed in a cold, calculated, and premeditated manner (CCP); and (5) the murder was especially heinous, atrocious, or cruel (HAC).
[4] Guzman contended that the trial judge erred by (1) improperly denying his motion for mistrial; (2) convicting him in the absence of substantial and competent evidence of guilt; (3) failing to dismiss the case due to double jeopardy; (4) improperly ruling on "various issues"; (5) imposing a disproportionate death sentence; (6) improperly finding the HAC aggravator; (7) improperly finding the "avoiding arrest" aggravator; and (8) improperly finding the CCP aggravator.
[5] The eleven claims Guzman presented to the trial court in his 3.850 motion were: (1) his conviction and sentence on retrial violate double jeopardy as well as protections against prosecutorial misconduct and ineffective assistance of counsel; (2) ineffective assistance of counsel in the guilt phase in failing to present evidence, cross-examine witnesses, and use experts; (3) ineffective assistance of counsel in the penalty phase in failing to adequately investigate and present mitigating evidence, and in failing to adequately challenge the State's case; (4) failure of the mental health expert to conduct a competent evaluation; (5) violation of due process rights in the State's withholding material exculpatory evidence or failing to correct material false testimony; (6) prosecutorial misconduct in presenting misleading evidence and improper argument; (7) Florida's capital sentencing statute is unconstitutional; (8) execution by electrocution is cruel and unusual punishment; (9) execution by lethal injection is cruel and unusual punishment; (10) defendant may be incompetent at the time of execution; and (11) the cumulative effect of the errors deprived defendant of a fundamentally fair trial.
[6] Florida's DNA statute, section 925.11, Florida Statutes (2002), was enacted effective October 1, 2001, giving Guzman the right to this testing.
[7] The three claims Guzman added were: (12) the State's bad faith destruction of exculpatory evidence violated Guzman's due process rights; (13) the State committed a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose the destruction of the hair evidence; and (14) ineffective assistance of trial counsel in failing to ascertain that the hair evidence had been destroyed.
[8] In her specially concurring opinion in Trepal v. State, 846 So.2d 405, 437 (Fla.)(Pariente, J., specially concurring), cert. denied, ___ U.S. ___, 124 S.Ct. 412, 157 L.Ed.2d 295 (2003), Justice Pariente noted the confusion and succinctly stated the difference between the standards.
[9] This is the same standard that is used to evaluate the prejudice prong of an ineffective assistance of counsel claim. See Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (stating that "the appropriate test for prejudice [in ineffective assistance of counsel claims] finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution," that in an ineffective assistance of counsel claim "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" and that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome").
[10] In United States v. Alzate, 47 F.3d 1103 (11th Cir.1995) the court, after articulating the standard of materiality applicable to Brady claims, stated:

A different and more defense-friendly standard of materiality applies where the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony. Where either of those events has happened, the falsehood is deemed to be material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103[, 96 S.Ct. 2392, 49 L.Ed.2d 342] (1976) (emphasis added). As the Supreme Court has held, this standard of materiality is equivalent to the Chapman v. California, 386 U.S. 18, 24[, 87 S.Ct. 824, 17 L.Ed.2d 705] (1967), "harmless beyond a reasonable doubt" standard. Bagley, 473 U.S. at 679 n. 9 [, 105 S.Ct. 3375].
Id. at 1110 (citations and footnote omitted), quoted in Trepal, 846 So.2d at 439 (Pariente, J., specially concurring).
[11] The Alzate court stated that the Brady standard of materiality "is substantially more difficult for a defendant to meet than the `could have affected' standard we apply [to Giglio claims]." Alzate. 47 F.3d at 1110 n. 7.
[12] In its articulation of the Giglio standard, the lower court correctly stated that the false testimony is material if "there is a reasonable probability that the false evidence may have affected the judgment of the jury." The confusion, however, is attributable to the second sentence in the court's articulation, stating that, "[i]n analyzing this issue ... courts must focus on whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." This second sentence is correctly used to analyze Brady claims, but is inappropriate to analyzing claims under the more defense-friendly standard of Giglio.
[13] Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[14] Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).