911 So.2d 57 (2005)
William Duane ELLEDGE, Appellant,
v.
STATE of Florida, Appellee.
William Duane Elledge, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC03-1201, SC04-998.
Supreme Court of Florida.
June 9, 2005.
Rehearing Denied September 2, 2005.
*60 Hilliard E. Moldof, Fort Lauderdale, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Carolyn M. Snurkowski, Assistant Deputy Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
William Duane Elledge appeals an order of the circuit court denying his motion for *61 postconviction relief under Florida Rule of Criminal Procedure 3.850 and petitions the Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.

FACTS AND BACKGROUND
This appeal involves allegations of error pertaining to Elledge's fourth penalty phase proceeding after which he was sentenced to death for the 1974 first-degree murder of Margaret Anne Strack. In 1974, Elledge confessed to a weekend of crimes which included the rape and murder of Margaret Anne Strack and the murder and robbery of Edward Gaffney and Kenneth Nelson.[1] Elledge pled guilty to all of these crimes. In March 1975, he was sentenced to death for the murder of Strack. This Court reversed Elledge's sentence of death and remanded the case to the trial court for a new penalty phase proceeding because the trial court admitted evidence of the Gaffney murder  a crime with which Elledge had been charged but not yet convicted. See Elledge v. State, 346 So.2d 998, 1002 (Fla. 1977). Ultimately, Elledge received sentences of life imprisonment for the Nelson and Gaffney murders.
On remand, Elledge was again sentenced to death. This Court affirmed that sentence in 1981, see Elledge v. State, 408 So.2d 1021 (Fla.1981), and in 1983 denied Elledge's motion for postconviction relief and state habeas corpus petition. See Elledge v. Graham, 432 So.2d 35 (Fla.1983). However, Elledge received federal habeas relief from the United States Court of Appeals for the Eleventh Circuit based on the trial court's decision to order Elledge shackled during the proceedings. See Elledge v. Dugger, 823 F.2d 1439 (11th Cir.), opinion partially withdrawn on petition for rehearing, 833 F.2d 250 (11th Cir. 1987).
Elledge's third penalty phase proceeding again resulted in the entry of a death sentence. In 1993, this Court reversed that sentence and remanded the case for a new penalty phase proceeding due to the trial court's failure to conduct a Richardson[2] hearing when Elledge's counsel objected to the State's failure to comply with discovery rules. See Elledge v. State, 613 So.2d 434 (Fla.1993).[3]
Elledge's fourth penalty phase proceeding was conducted in November of 1993, and resulted in the jury recommending the death sentence by a vote of nine to three. See Elledge v. State, 706 So.2d 1340 (Fla. 1997) ("Elledge IV"). The trial judge again sentenced Elledge to death, finding four aggravating circumstances,[4] no statutory mitigating circumstances, and three *62 nonstatutory mitigators[5] to which the trial court accorded little weight cumulatively. See id. at 1342. Elledge raised twenty-seven issues during the direct appeal of his sentence, and this Court affirmed the sentence of death. See id. at 1342, 1347. The United States Supreme Court denied Elledge's petition for writ of certiorari to review this Court's decision. See Elledge v. Florida, 525 U.S. 944, 119 S.Ct. 366, 142 L.Ed.2d 303 (1998). Justice Breyer dissented from the majority's decision, positing that the High Court should review Elledge's case to determine if his then twenty-three year stay on death row violated his constitutional rights. See id. at 944-46, 119 S.Ct. 366 (Breyer, J., dissenting).
On September 22, 1999, Elledge filed a shell motion for postconviction relief presenting thirty-six claims. Elledge filed an amended motion to vacate judgment on March 27, 2000, presenting fifteen claims. Subsequently, Elledge submitted a second amended motion on May 29, 2001, which contained fourteen claims.[6]
A Huff[7] hearing was held on September 21, 2001. On December 14, 2001, the trial court entered an order determining that an evidentiary hearing was required on portions of Elledge's ineffective assistance of counsel claim, the claim alleging inadequate assistance of mental health experts, and the conflict of interest claim. An evidentiary hearing was conducted from July 1 through July 3, 2002. In April 2003, the trial court issued an order denying Elledge postconviction relief. Elledge appeals the trial court's denial of his 3.850 motion and also petitions this Court for writ of habeas corpus. Each of Elledge's claims is addressed below.

Brady Claim
Elledge claims that the State violated the rule established in Brady v. Maryland, *63 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose an EEG test conducted by Dr. Norman, a neurologist engaged by defense counsel in advance of Elledge's 1993 penalty phase proceeding. According to Elledge, the EEG was performed under conditions of hyperventilation and photic stimulation, and was the type of test consistently requested by Dr. Dorothy Lewis, a mental health expert who had examined Elledge as part of a death row study in the mid-1980s, and whom defense counsel initially contacted for the purpose of testifying at the 1993 penalty phase proceeding, but ultimately did not present as a witness. Dr. Lewis had also testified on Elledge's behalf during his federal habeas proceeding. See Elledge v. Dugger, 823 F.2d 1439 (11th Cir.1987). Elledge claims that the State's failure to disclose the results of this test was material because such disclosure would have rehabilitated Dr. Lewis, whom defense counsel characterized as uncooperative, and because the results of the test might have opened new corridors of mental health mitigation for Dr. Lewis to explore. Elledge asserts that in the absence of Dr. Lewis's testimony, he was left with the conflicting and detrimental testimony of the two mental health experts presented by his defense team.
To establish a Brady violation, a defendant must show: (1) evidence favorable to the accused, because it is either exculpatory or impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that prejudice ensued. See Guzman v. State, 868 So.2d 498, 508 (Fla.2003) (citing Jennings v. State, 782 So.2d 853, 856 (Fla. 2001)). The Brady rule embraces evidence that is material to the defendant's guilt or, as in this case, punishment. See Trepal v. State, 846 So.2d 405 (Fla.2003), receded from on different grounds in Guzman, 868 So.2d at 506. Prejudice under the Brady analysis is measured by determining "whether `the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Carroll v. State, 815 So.2d 601, 619 (Fla.2002) (quoting Strickler v. Greene, 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).
The trial court was correct in denying Elledge's Brady claim because he cannot satisfy any of the elements of the Brady test. Elledge cannot satisfy the first requirement of the Brady test because the results of the EEG conducted by Dr. Norman cannot be characterized as favorable to the defense. As previously stated, Dr. Norman is a neurologist who was engaged by Elledge's defense counsel prior to the 1993 penalty phase proceeding but ultimately not presented as a witness.
The EEG testing that Dr. Norman conducted on Elledge in 1993 revealed no abnormalities. Dr. Norman generated a report regarding the results of the EEG testing. This report, dated October 4, 1993, was submitted as State's exhibit 14 during the postconviction evidentiary hearing. State's exhibit 14 also includes an MRI conducted by one of Dr. Norman's associates.[8]
In the report, Dr. Norman explained that the EEG testing revealed largely "normal patterns of brain activity" with periodic and infrequent slowing which the report described as a "very non-specific finding" that may have represented "simply mild drowsiness." The EEG report *64 specifically stated, "Hyperventilation and photic stimulation produced no changes," and that the results were considered to be within normal limits. Indeed, Elledge's trial counsel, William Laswell, confirmed during the evidentiary hearing that he did not present Dr. Norman as a witness because the doctor's evaluation of Elledge was normal. Any postconviction assertion that Dr. Lewis could have mined the data underlying the EEG report to discover mitigating evidence pertaining to Elledge's mental status is totally speculative at best and does not support the existence of a Brady violation.
Elledge is similarly unable to establish that the State either willfully or inadvertently suppressed the EEG report marked State's exhibit 14. Several key pieces of evidence undermine the contention that Elledge's trial counsel never received a copy of the EEG report. As a threshold matter, Dr. Norman was a defense expert who was engaged by Elledge's counsel to conduct a neurological evaluation and related testing prior to the 1993 penalty phase proceeding. It stands to reason that the defense team would have been aware of his conclusions and would have received copies of his report prior to deciding whether or not to present him as a witness. Importantly, neither Laswell nor James Ongley, who assisted Laswell in Elledge's defense and is himself a medical doctor and former medical examiner, testified with certainty that they had not seen the EEG report. Indeed, Laswell was shown a second document  a four-page letter from Dr. Norman to Laswell, dated October 4, 1993 (the same date as the questioned report), which detailed Dr. Norman's neurological evaluation of Elledge and relayed that Elledge did not suffer from a seizure disorder and showed no definite neurological abnormalities. The letter further stated that Elledge had not received EEG or MRI testing prior to the evaluation, and that Dr. Norman would review the results of these tests once given and forward the results to Laswell. Laswell surmised that the EEG marked as State's exhibit 14 was the report Dr. Norman referenced in the October 4 letter. Laswell testified that he had no reason to believe that Dr. Norman (the defense expert), did not provide him the EEG report as promised, and further represented that because he listed Dr. Norman as a witness, he would have furnished any such report to the State.
Moreover, Laswell testified that the defense team only paid for a single report from Dr. Norman, and, to his knowledge, only one report was submitted. Neither party has offered to this Court nor the court below an EEG report other than the EEG report marked State's exhibit 14, which clearly states that the results of the EEG did not vary with hyperventilation and photic stimulation. The clear implication is that Dr. Norman had several tests conducted on Elledge on October 4, 1993, and relayed the results in a single report. Furthermore, postconviction counsel did not present Dr. Norman as a witness during the evidentiary hearing to explore any details concerning his October 1993 EEG report or the persons with whom he had discussed or to whom he had distributed the report.
Further bolstering the conclusion that the State did not suppress the EEG report is that the EEG testing was actually mentioned during the State's deposition of Dr. Norman conducted on October 18, 1993. Ongley represented Elledge at the deposition of Dr. Norman and testified in postconviction that if he had not reviewed the EEG report prior to that time, he would have certainly obtained copies during the *65 deposition.[9] Indeed, the fact that the EEG was discussed at Dr. Norman's deposition explains how the State received the copy of the report marked State's exhibit 14. In response to questioning directly from the trial court during the evidentiary hearing, State Attorney Michael Satz, who represented the State during Elledge's 1993 penalty phase proceeding, stated that he would not have taken the deposition of a doctor without having a copy of his report. This contention is bolstered by the fact that the EEG report marked State's exhibit 14 contained a cover sheet indicating that it was faxed to Satz's secretary on October 14  four days before Dr. Norman's deposition.
Additional evidence in support of the conclusion that the State did not suppress the EEG report is that it was also mentioned at least twice during the course of the 1993 penalty phase. First, during the State's cross-examination of the defense mental health expert, Dr. Schwartz, prosecutor Satz inquired whether the doctor was aware that a neurologist performed an EEG on Elledge in October of 1993. Dr. Schwartz responded that he was aware that an EEG was performed, but was informed by defense counsel Laswell that the results were normal. Dr. Schwartz also testified that Laswell had informed him that the result of the MRI testing was also normal. This also supports the conclusion that Laswell was once in possession of a copy of the EEG report marked State's exhibit 14, which was accompanied by the results of the MRI administered by Dr. Norman's associate.
Second, the trial court referenced the EEG performed by Dr. Norman in its 1993 telephone conversation with Dr. Lewis regarding what further testing she would need of Elledge to be prepared to testify in his case. While this phone conversation is discussed in greater detail with regard to Elledge's ineffective assistance of counsel claim, for purposes of the Brady claim, it is important to note that the trial court gave Dr. Lewis a broad-brush overview of the evidence that had been collected in preparation for the 1993 penalty phase. In so doing, the trial court specifically stated that an MRI and EEG had been performed on Elledge in October of 1993.
Even Dr. Lewis could not state with any certainty that she had never seen the report marked State's exhibit 14. During the evidentiary hearing, Dr. Lewis testified on direct examination that she would have liked to have subjected Elledge to a sleep-deprived EEG or one with photic stimulation to increase the likelihood of discovering abnormal electrical activity in the brain. That assertion led the State to inquire upon cross-examination whether Dr. Lewis realized that such testing had occurred on October 4, 1993. Dr. Lewis responded:
A. There is on October 4, 1993. I was going to say, I thought that Dr. Norman ordered that.
When asked whether the test results were normal, Dr. Lewis stated:
A. It had some references in it to say this is probably normal. It had some *66 abnormal activity and, to the best of my knowledge, they could not decide whether it was the result of drowsiness or something else. They called it normal, but if I were, you know, working on the case at that time and doing that, I would have repeated it and done more to figure it out.
Dr. Lewis's recollection of the exact conclusion reached by Dr. Norman in the EEG report marked State's exhibit 14 belies the contention that Dr. Lewis did not have access to the EEG report and could not have known that an EEG had been administered under conditions of hyperventilation and photic stimulation.[10]
Finally, Elledge cannot satisfy the prejudice prong of the Brady analysis. As previously stated, the results of the EEG were normal. The assertion that Dr. Lewis could have used the document to establish mental health mitigation is highly speculative. As a threshold matter, Dr. Lewis would not have been able to interpret the results of the tests. During the course of the 1993 on-the-record telephone conversation with the trial court and the parties, Dr. Lewis stated that a different physician, Dr. Pincus, was the expert who should be consulted to interpret the results of any such specialized tests. On this basis, the value of the EEG report to Dr. Lewis's testimony is most questionable on this issue.
Moreover, Dr. Lewis's testimony regarding the EEG revealed only that the report would have led her to do additional testing. Dr. Lewis explained at length that a normal EEG would not be surprising from an individual like Elledge, who she surmised suffered from an episodic seizure-like disorder that would not register on EEGs administered at a time when he was not under the effect of a seizure. Dr. Lewis then outlined a series of follow-up tests that would be required to truly rule out the existence of abnormal activity. Thus, when viewed in the light most favorable to the defense, the only "benefit" of Dr. Norman's EEG report is that it would not have completely undermined Dr. Lewis's diagnosis that Elledge suffered from an episodic brain disorder. Elledge cannot demonstrate that the State's alleged suppression of the document would cast the case in such a different light as to undermine confidence in the sentence rendered.
Alternatively, Elledge offers that the mere existence of the hyperventilation/photic stimulation EEG  the performance of which Dr. Lewis had repeatedly urged  would have somehow rehabilitated her credibility in the eyes of Elledge's defense counsel thereby encouraging the defense team to use her as a witness, as opposed to the utilization of allegedly insufficient experts that were presented during the penalty phase. This would have benefited Elledge, the argument goes, because Dr. Lewis was prepared to testify to the existence of significant mental health mitigation. However, as discussed further in the section pertaining to Elledge's ineffective assistance of counsel claim, the revelation of such testing would not have likely *67 encouraged defense counsel to present Dr. Lewis, and would not have bolstered the credibility of her conclusions. The trial court's conclusion regarding Dr. Lewis's lack of value to Elledge's defense was based on numerous shortcomings illuminated during the postconviction proceeding  not simply the absence of tests long requested by Dr. Lewis. Elledge fails to satisfy the elements of this claim and his Brady claim is thus meritless.

Giglio Claim
Elledge's Giglio[11] claim based on the State's purported failure to disclose the EEG report is similarly meritless. To establish a Giglio violation, it must be shown that (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material. See Guzman, 868 So.2d at 505. A Giglio claim is based on the State's knowing presentation at trial of false testimony against the defendant. See id.
Neither Dr. Norman nor Dr. Lewis testified during Elledge's 1993 penalty phase proceeding. Elledge fails to offer any citation to the penalty phase proceedings indicating that the existence or nonexistence of a hyperventilation or photic stimulation EEG was at issue during the proceeding. Moreover, the report itself does not constitute false evidence. In short, Elledge's Giglio claim fails to satisfy any of the elements required by that standard.

Ineffective Assistance of Counsel  Failure to Call Dr. Lewis
As stated by this Court following the announcement of the United States Supreme Court's seminal decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), for an ineffective assistance of counsel claim to succeed, the claimant must satisfy both prongs of the following two-part test:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined.
Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986). In reviewing claims of ineffective assistance of counsel, this Court will defer to the trial court's findings of fact and review as questions of mixed law and fact whether counsel's performance was ineffective and whether the defendant was prejudiced by that ineffective performance. See Ragsdale v. State, 798 So.2d 713, 715 (Fla.2001). To fairly assess counsel's performance, the reviewing court must make every effort to eliminate the "distorting effects of hindsight" and to evaluate the conduct from counsel's perspective at the time. Strickland, 466 U.S. at 689, 104 S.Ct. 2052.
Elledge contends that trial counsel Laswell's decision not to utilize Dr. Lewis as a witness was unreasonable because it was predicated on a personality clash and resulted in the reliance on two unqualified, improperly prepared, and conflicting experts. Elledge contends that Dr. Lewis would have offered substantial mitigating evidence pertaining to Elledge's mental health, but that Elledge was denied the benefit of this evidence because Laswell failed to establish the necessary rapport with Dr. Lewis and delegated her trial preparation to an attorney not familiar with her work.
*68 The trial court determined that Laswell's failure to present Dr. Lewis as a witness in the 1993 proceeding was a direct result of Dr. Lewis's reluctance to testify. On this point, the trial court found:
Based upon the testimony adduced at the evidentiary hearing, this Court finds that Dr. Lewis did not have any intention of appearing and testifying on behalf of the Defendant at the trial in 1993. Her failure to appear was not the fault of Mr. Laswell or Dr. Ongley, but rather by her lack of preparedness and her reluctance to undergo cross-examination, perhaps of the kind she had experienced during the federal habeas corpus hearing by the same State Attorney, Michael Satz.... Having heard the testimony and reviewed the evidence, this Court finds that Dr. Lewis' testimony was totally devoid of credibility and that it was Dr. Lewis's [sic] complete lack of cooperation which resulted in her failure to testify.
In rendering this determination, the trial judge had the unique insight gained from two separate on-the-record conversations with Dr. Lewis during the course of the 1993 penalty phase proceeding. The record of both the postconviction evidentiary hearing and the 1993 penalty phase support the trial court's determination.
In 1983, Dr. Lewis had evaluated Elledge as a part of a study she, together with a neurologist, Dr. Pincus, conducted with death row inmates in an effort to link homicidal tendencies to temporal lobe epilepsy. Laswell testified during the evidentiary hearing that he contacted Dr. Lewis in the summer of 1993 and stated that she initially expressed a willingness to provide assistance. Laswell further testified that despite this initial willingness she had expressed, she failed to review her prior file from the 1983 evaluation. Laswell stated that Dr. Lewis consistently requested additional testing and evaluation of Elledge even though he had informed her that he wanted her to testify regarding her original evaluation of Elledge, which, in his view, came closest in time to the murder and would provide the most forceful evidence.
As the 1993 penalty phase approached, Dr. Lewis's status as a testifying witness was uncertain. Laswell testified during the evidentiary hearing that his final conversation with Dr. Lewis occurred two days after opening remarks had been presented in the penalty phase and ended in frustration with Laswell concluding the conversation with the doctor when she informed him that she could not appear as scheduled on November 8. Laswell subsequently obtained a court order compelling Dr. Lewis to appear to testify on Monday and Tuesday, November 8 and 9.
Laswell's characterization of the material events is fully supported by the transcript of the on-the-record phone conversation between the trial court, the parties, and Dr. Lewis during a recess in the proceedings on November 8 for which Dr. Lewis had failed to appear. Dr. Lewis blamed her failure to appear on the fact that she had received a message from Laswell's office on the preceding Thursday that the November 8 proceeding had been cancelled, and that by the time she received word on Friday that the proceeding would go forward, she had already made plans for the 8 and 9. Tellingly, however, when the trial judge inquired as to whether she had reviewed her file in the case, she responded that she had not reviewed the file in many years, that she usually reviews for a case the day before she testifies, and that she did not have Elledge's file with her at home when she received word that the proceeding would go forward. After some discussion, Dr. *69 Lewis agreed to appear as a witness on Monday the 15th. Prior to ending the telephone conversation, Laswell informed her that Ongley would conduct her direct examination.
Dr. Lewis did not, however, appear on November 15. During this evidentiary hearing, Dr. Lewis testified that she did not appear because she believed Ongley was not capable of preparing her and had advised her that it was against Elledge's interests for her to testify. This testimony was largely contradicted by that of Ongley. Ongley conceded that he did not know the full content of the testimony of all other witnesses, and that preparing Dr. Lewis the weekend before her testimony would have been difficult, but disagreed with Dr. Lewis's contention that he had stated that it would not be in Elledge's best interests if she testified. According to Ongley, Dr. Lewis had already decided that she was not going to testify in the matter and there was nothing that he could say to change her mind.
Ongley's characterization of Dr. Lewis as a thoroughly reluctant witness is fully supported by the transcript of the second on-the-record telephone conversation between the trial court, the parties, and Dr. Lewis, which occurred on November 15, 1993. During the course of that conversation, Dr. Lewis stated that she did not feel it was appropriate for her to testify if Laswell did not think she would be an asset. This contention rings hollow, however, because Laswell had informed her during the course of the November 8 conversation that he had advised Elledge against calling her as a witness, but she nonetheless agreed to appear on the 15th. She also relayed that Ongley had advised that he felt unable to prepare her because he was unfamiliar with her work and did not know the substance of the testimony of the other expert witnesses. This contention was undermined, however, when the trial court informed her that the rule of sequestration had been invoked in the case, thus precluding her from being informed of the content of other witnesses' testimony.[12] In response to a question directly from Elledge regarding what additional information she would need to testify, she responded that she would need to review old records and possibly interview him and his family members again. Dr. Lewis attested to the need for an updated evaluation of Elledge despite the fact that Laswell had informed her that he wanted her to testify regarding her 1983 evaluation of Elledge, which was the evaluation that had occurred nearest in time to the murders.
Toward the close of the November 15 on-record conversation, Dr. Lewis's lack of intent to be involved in the case was totally clear. She restated her recommendation that Dr. Pincus submit Elledge to further sensitive EEG testing. She indicated that once Dr. Pincus conducted and interpreted the tests, she would testify if still needed, but continued to underscore her need to completely reevaluate Elledge.[13] Incredibly, when asked by the trial court whether  in the event that Elledge continued to want her to testify  she would be able to testify in the near future if she were given *70 time to test Elledge as she saw fit and prepare as she wanted, she responded that her daughter was getting married the following week and that her schedule was booked on other matters until February.[14]
Clearly, on the basis of this record, defense counsel's failure to call Dr. Lewis can be attributed to no other cause than Dr. Lewis's construction of numerous insurmountable and unreasonable barriers to testifying in this case. Dr. Lewis presented a constantly evolving story of why she could not testify in Elledge's case, which, as found by the trial court, thinly guised a lack of intention to testify from the start. Trial counsel's performance in failing to secure the testimony of such an impossibly recalcitrant witness can hardly be characterized as deficient.
Although Elledge's ineffective assistance of counsel claim can be determined on the basis that trial counsel's performance was not deficient, see Strickland, 466 U.S. at 697, 104 S.Ct. 2052 ("[T]here is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one"), Elledge similarly cannot demonstrate that he was prejudiced by Dr. Lewis's failure to testify during his 1993 penalty phase. Notably, one reviewing court has already determined that Elledge would have likely received the death penalty even with the addition of Dr. Lewis's testimony. In his petition for habeas relief in federal district court, Elledge argued that counsel in his second penalty phase proceeding (which occurred in 1977) was deficient in failing to advance any mental health mitigating evidence. In support, Elledge offered the testimony of Dr. Lewis, who opined that he suffered from organic brain dysfunction, episodic rages, and paranoid behavior. She testified that the combination of organic brain dysfunction, psychotic paranoia, and childhood abuse caused a disorder that affected Elledge during the Strack homicide. See Elledge v. Dugger, 823 F.2d at 1445 n. 12. In agreeing with the district court's conclusion that Elledge was not prejudiced by trial counsel's failure to secure mental health testimony such as that produced by Dr. Lewis, the circuit court stated:
The value of Dr. Lewis's testimony was undercut in part by the revelation that her analysis largely relied on Elledge's recitations and had not been fully corroborated by independent follow-up investigation. In addition, the two court-appointed psychiatrists who examined Elledge each gave damaging evaluations that would have diluted Dr. Lewis's impact. [N.18]
[N.18.] Of all the several experts who examined Elledge over the years, only Dr. Lewis found him to be operating under extreme emotional or emotional disturbance caused by organic brain damage. The great weight of expert testimony clearly cut against Dr. Lewis's testimony and made it less persuasive.
Elledge v. Dugger, 823 F.2d at 1447 & n. 18.
Dr. Lewis offered conclusions in this evidentiary hearing that were substantially similar to those offered in the federal habeas proceeding. She testified that if she had been called as a witness she would have opined that both statutory mental health mitigators (extreme emotional disturbance and inability to conform conduct to the requirements of law) applied to Elledge. *71 However, as discussed in the trial court's order denying Elledge's 3.850 motion, the State's cross-examination of Dr. Lewis during the evidentiary hearing exposed many weaknesses in her testimony. The State's questioning revealed numerous inconsistencies between her testimony in the federal habeas proceeding and the statements Elledge himself gave police; the failure to corroborate the background and history provided by Elledge; the findings of numerous other mental health experts who had diagnosed Elledge as having an antisocial personality disorder;[15] and the findings of neuropsychologist Dr. McMahon, who evaluated Elledge along with Drs. Lewis and Pincus in 1983, and determined that the results of his neuropsychological test battery were essentially within normal limits. Another factor which surfaced during cross-examination was Dr. Lewis's admission that it required nearly three years for her to heal emotionally from the controversy associated with her participation in a case that originated in Rochester, New York,[16] and that Elledge's 1993 penalty phase proceeding occurred during this recovery period. This record supports the conclusion that Elledge was not prejudiced by the absence of Dr. Lewis's testimony. The Strickland elements have not been satisfied on this claim.

Ineffective Assistance of Counsel/Inadequate Assistance of Mental Health Experts
Elledge further contends that he was denied effective assistance of counsel because trial counsel relied on mental health experts who were not board-certified, were improperly prepared, and who provided conflicting testimony. Elledge also claims that this ineffectiveness violated the rule established in Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), which requires the State to assure a defendant who demonstrates that his sanity will be a significant factor at trial access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. As explained further below, even if it is assumed that Elledge's trial counsel was somehow deficient in the selection or presentation *72 of these witnesses, the record does not support a determination that Elledge was prejudiced. Moreover, the record does not support the contention that Elledge was denied an adequate mental evaluation as required by Ake.
The record of the 1993 penalty phase proceeding demonstrates that both Drs. Schwartz and Caddy testified on direct examination that at the time of the Strack murder, Elledge qualified under both of Florida's statutory mitigators pertaining to mental health, namely, that Elledge was operating under extreme mental or emotional disturbance and that his ability to conform his conduct to the requirements of the law was substantially impaired. Moreover, both experts testified with regard to the details of Elledge's background, including severe poverty, substantial physical and emotional abuse, the alcoholism of both of Elledge's parents, and Elledge's own alcoholism and drug addiction, and the impact such conditions had on Elledge's thought processes and behaviors. Although they used slightly different terminology, both experts also agreed that Elledge had characteristics of antisocial personality disorder.[17]
There were also differences of opinion between the defense experts. As set forth in the trial court's 1993 sentencing order, Dr. Caddy did not concur with Dr. Schwartz's conclusions regarding the existence of organic brain damage or that Elledge suffered from fetal alcohol syndrome or post-traumatic stress disorder. The trial court noted these inconsistencies and that Dr. Caddy's testimony diminished Dr. Schwartz's credibility. However, the thrust of the trial court's deconstruction of these mental health experts was not that they provided inconsistent testimony, but that their diagnoses were contradicted by the facts of the case and other episodes in Elledge's history. For instance, the trial court found evidence that undermined Dr. Caddy's finding that the Strack murder was a result of a "rage reaction" during which Elledge was completely out of control with the doctor's admission that certain aspects of the murder  such as Elledge temporarily ceasing the strangulation when Strack momentarily conceded to have sex with him  exhibited Elledge's ability to control himself. The trial court further found facts which conflicted with Dr. Caddy's assessment of the details of two instances in Elledge's past during which he had exercised control *73 over his violent impulses. The trial court determined that the impact of Dr. Schwartz's testimony was similarly diminished by the revelation of such facts. Ultimately, the trial court gave more weight to the testimony of Dr. Stock, the State's mental health expert, who concluded that Elledge has an antisocial personality disorder.
Based on this record, Elledge cannot viably assert that trial counsel's presentation and preparation of the mental health experts prejudiced his defense. Indeed, on direct appeal, this Court rejected Elledge's argument that he was entitled to a new penalty phase proceeding because the trial court mischaracterized Dr. Caddy's testimony in the sentencing order by incorrectly stating that Dr. Caddy had not found the emotional disturbance statutory mitigator applicable. This Court determined that the trial court's misstatement of Dr. Caddy's finding constituted harmless error in light of the testimony of Dr. Stock, who concluded that Elledge did not suffer from any mental illness, impulse control disorder, or stress disorder, but instead had an antisocial personality. See Elledge IV, 706 So.2d at 1347.
As demonstrated, it was the facts presented and Elledge's own history that countered the mental mitigating evidence offered by his defense. Elledge cannot establish that he was prejudiced by trial counsel's allegedly deficient selection or preparation of the mental health experts or that he received constitutionally infirm assistance of mental health professionals under Ake. Indeed, accepting Elledge's contention would have the consequence of discouraging trial counsel from presenting the testimony of multiple experts who agree with regard to the major overarching diagnosis, but not with regard to every underlying detail, or of encouraging the manufacture or presentation of expert testimony only to meet the precise facts of the case.[18] Neither outcome would be appropriate, and the law entrusts the finder of fact to properly weigh expert testimony  even that which may not be in perfect unison.

Conflict of Interest
To prove an ineffectiveness claim predicated on an alleged conflict of interest, the defendant must establish that an actual conflict adversely affected counsel's performance. See Cuyler v. Sullivan, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). To demonstrate an actual conflict, the defendant must identify specific record evidence suggesting that his interests were impaired or compromised for the benefit of his lawyer or a third party. See Herring v. State, 730 So.2d 1264, 1267 (Fla.1998). These standards cannot guide the analysis in the instant matter because Elledge's claim is not one of true conflict.
*74 Elledge argues that trial counsel Laswell's inability to work with Dr. Lewis establishes a conflict of interest between lawyer and client. This contention is meritless. For the reasons discussed above, which need not be addressed further within the context of this claim, the failure of Laswell to present Dr. Lewis was the direct result of her failure to appreciate the strategy and plan that her testimony would be limited to her initial evaluation of Elledge and her failure to review her file pertaining to that evaluation. This does not establish a conflict of interest.
The remainder of Elledge's conflict of interest claim focuses on what transpired at a Spencer[19] hearing. Elledge now claims that during the Spencer hearing he operated essentially without the benefit of a lawyer when he was permitted to present evidence in support of a life sentence and to address counsel's ineffectiveness. According to Elledge, trial counsel impermissibly disassociated himself from his client when he called witnesses at the Spencer hearing to support the efforts he made on Elledge's behalf. Elledge also alleges that the trial court recognized that Laswell was overwhelmed by the task of representing Elledge. The record does not support Elledge's contentions.
At the start of the Spencer hearing, trial counsel Laswell acknowledged that he and Elledge did not see "eye to eye" on many issues, that Elledge had substantially critiqued his performance, and that he wanted to provide Elledge the opportunity to "address the Court about the issue of my behavior, why he didn't get a fair trial, and other matters." Elledge proceeded to address the Court at length regarding a variety of issues including asserted errors in the State's case, his own personal evolution and regret for the crimes committed, asserted errors in the court's evidentiary rulings, additional mitigation witnesses he would have liked to have called, and the problems associated with the delay between the crime committed and the fourth penalty phase. Indeed, it was on this last point  the difficulty in obtaining mitigating evidence twenty-odd years after the crime  that Laswell presented the only witness called in the Spencer proceeding, Philip Charlesworth, lead investigator for the public defender's office. Charlesworth testified with regard to all of the investigatory steps taken by the public defender's office and the trouble they encountered in unearthing mitigation due in part to the time that had passed between the crime and the fourth penalty phase proceeding in 1993, and also due in part to the fact that Elledge led a transient lifestyle through his midadolescence and early adulthood. A review of the transcript reveals that Charlesworth was not presented, as Elledge now claims, to defend Laswell's efforts in a manner intended to disassociate trial counsel from his client.
In fact, Elledge's direct criticism of his trial counsel's efforts at the Spencer hearing was really minimal, and his comments were largely directed to what Elledge characterized as the enormity of the task at hand.[20] Elledge stated that he liked *75 Laswell, but felt that Laswell was overwhelmed by the case and needed the assistance of co-counsel. Elledge relayed his belief that Laswell was forced to delegate much of the investigation to others and was overwhelmed by coordinating all of the information that resulted from the work. In response to this point, the trial court engaged in the following dialogue with Elledge, a dialogue which postconviction counsel plainly misinterprets in Elledge's briefing paper:
THE COURT: The Court recognizes that we're not here to determine the effective or ineffective assistance from Mr. Laswell. At the same time the Court finds that from your comments just now, that Mr. Laswell certainly had his heart in the right place and certainly 
THE DEFENDANT: He did.
THE COURT:  From what you say did as good a job as possible but was overwhelmed by the task of it. The Court doesn't find Mr. Laswell to be criticized by you.
Postconviction counsel excerpts only that which is plainly the trial court parroting back Elledge's concerns to ensure a complete understanding, and then attempts to support the argument that the trial court acknowledged that Laswell was in fact overwhelmed. The record simply cannot and does not support or sustain this allegation, or that the Spencer hearing became a mini-3.850 proceeding during which Elledge was denied the benefit of counsel. On the basis of this record, Elledge has totally failed to establish any conflict of interest.

Excessive Security Measures
Elledge claims that the trial court erred in denying his motion for mistrial predicated on the appearance of a uniformed deputy in the courtroom and the employment of two plainclothes deputies who had allegedly brandished their weapons in front of the jury. Elledge further asserts that defense counsel was ineffective for failing to request the trial court to question the jury regarding whether they had seen the deputies' weapons. Elledge also contends that the excessive security measures continued into the postconviction proceeding where the prosecutor attempted to taint the proceedings by injecting security concerns.
Any substantive constitutional challenge to the restraint employed during the penalty phase could have and should have been presented on direct appeal and is thus procedurally barred. See Harvey v. Dugger, 656 So.2d 1253, 1256 (Fla.1995). The ineffective assistance of counsel portion of this claim is meritless. The record of the penalty phase proceeding reveals that Laswell did assert an unsuccessful motion for mistrial on the basis that an armed, uniformed deputy had entered the courtroom and that the appearance of the deputy implied that Elledge was dangerous in a manner that prejudiced him. The record also demonstrates the correctness of the trial court's decision denying that motion. The trial court explained that uniformed deputies had entered the courtroom that morning just as they had throughout the penalty phase, and just as they do every day in each courtroom in the Broward County Courthouse. The court explained that the deputy had remained in the back of the courtroom for a matter of minutes pursuant to the routine practice of *76 the Sheriff's Department in Broward County to circulate through the facility.
In response to Elledge's allegation that one of the plainclothes deputies had brandished a weapon holstered on his lower leg in front of the jury, the trial court received the sworn testimony of both plainclothes deputies assigned to the courtroom. The one positioned in an area closest to the jury testified that he had worn his weapon either on his lower leg, which was inside a twelve-inch boot covered by a trouser, or in a waist holster that was always covered by either a jacket or a vest. The deputy positioned to the rear of the courtroom testified that he sometimes wore an ankle holster and low-quarter shoes, but stated that he always sat in the back, was never near the jury, and that he never positioned himself in a manner that would have revealed the gun to any member of the jury. In the face of this sworn testimony, there was no deficit in Laswell's failure to further request the trial court to poll the jury to determine whether anyone had seen a weapon.[21]
Elledge's contention that the excessive security measures continued into the postconviction phase of his case is likewise meritless. In response to concerns raised by the State, the trial judge acknowledged that it had requested, but had not received, the personnel necessary to implement security measures standard to such matters. There was a brief pause in the proceedings while the necessary personnel were secured. Upon their arrival, the trial judge granted Elledge's request to have his hands uncuffed to facilitate note taking, and he remained shackled to the chair without objection.

Cruel and Unusual Punishment
On direct appeal of his fourth sentence of death, Elledge argued that the psychologically devastating effects of his prolonged stay on death row violated his rights under article I, sections 2, 9, 16, and 17 of the Florida Constitution and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Federal Constitution. This Court summarily denied the claim as meritless. See Elledge IV, 706 So.2d at 1347 n. 10. Nothing has transpired since that time that would cause this Court to revisit that conclusion.
Elledge's postconviction counsel was appointed in March of 1999, and filed a shell 3.850 motion in September of that year. After the filing of that motion, various records requests were filed and hearings were conducted. In March of 2000, Elledge filed an amended 3.850 motion.[22] Subsequent to that time, the parties filed additional pleadings pertaining to the production of records and additional hearings were held. The trial court also addressed ancillary matters such as motions for the payment of costs and conducted various status hearings. It was not until May 29, 2001, that Elledge filed his second amended 3.850 motion. A Huff[23] hearing was held on September 21, 2001. An order outlining the issues to be addressed during the postconviction evidentiary hearing was issued on December 14, 2001, and the evidentiary hearing itself was conducted from *77 July 1 through July 3, 2002. In April 2003, the trial court issued an order denying Elledge postconviction relief. On the basis of this record, we find no merit in Elledge's constitutional claim predicated on the cruel and unusual nature of his prolonged stay on death row. See, e.g., Lucas v. State, 841 So.2d 380, 389 (Fla. 2003) (holding twenty-five years on death row does not constitute cruel and unusual punishment; death sentence reversed in four previous appeals); Foster v. State, 810 So.2d 910, 916 (Fla.2002) (holding twenty-three years on death row does not constitute cruel and unusual punishment); Rose v. State, 787 So.2d 786, 805 (Fla.2001) (holding cruel and unusual punishment claim of inmate under death sentence since 1977 was without merit; death sentence reversed once on direct appeal and a second time in postconviction); Knight v. State, 746 So.2d 423, 437 (Fla.1998) (holding more than two decades on death row does not constitute cruel and unusual punishment).

Remaining Claims  3.850 Appeal
The remainder of the claims presented in Elledge's 3.850 appeal[24] are either procedurally barred or meritless and will not be addressed at length.[25] Elledge's contention that his now thirty-one-year stay on death row violates international law is procedurally barred as it could have but was not raised on direct appeal and is also meritless. See Knight, 746 So.2d at 437 (summarily denying the claim that Florida had forfeited its right to execute Knight under binding norms of international law). The ineffective assistance of counsel claim predicated on trial counsel's failure to object to the trial court's instruction regarding expert testimony fails because the trial court provided the standard jury instruction.[26]See Thompson v. State, 759 So.2d 650, 665 (Fla.2000) (holding that it is not deficient performance when counsel fails to object to a standard instruction which has not been invalidated by this Court).
With regard to Elledge's claim regarding the constitutionality of the rule governing an attorney's ability to interview jurors, we determine that the substantive constitutional challenge to the rule governing juror interviews is procedurally barred as it was not raised on direct appeal.[27]See Rose v. State, 774 So.2d 629, 637 n. 12 (Fla.2000) (holding that the claim "attacking the constitutionality of the Florida Bar Rule of Professional Conduct governing interviews of jurors [was] procedurally barred because Rose could have raised this issue on direct appeal"). Procedural bar notwithstanding, Elledge's claim lacks *78 merit. See Johnson v. State, 804 So.2d 1218, 1224-25 (Fla.2001) (rejecting contention that Rule Regulating the Florida Bar 4-3.5(d)(4) conflicts with defendant's constitutional rights to a fair trial and effective assistance of counsel).
Elledge's contention that he is innocent of the death penalty was decided adversely to Elledge on direct appeal and is not cognizable in the postconviction proceeding. This Court affirmed Elledge's sentence of death, specifically concluding that the trial court had not erred when it "independently weighed the aggravation and mitigation and explained that the four statutory aggravating factors, which were proven beyond a reasonable doubt, substantially outweighed the three non-statutory mitigating factors." Elledge IV, 706 So.2d at 1346. On this basis, Elledge's nested argument that the death sentence is disproportionate in his case similarly fails. The related contention regarding the trial court's misstatement of Dr. Caddy's conclusion was decided adversely to Elledge on direct appeal. See Elledge IV, 706 So.2d at 1347 (determining that the trial court's misstatement of Dr. Caddy's views constituted harmless error).
Elledge's contention that Florida's capital sentencing statute fails to prevent the arbitrary and capricious imposition of the death penalty and violates the due process guarantees against cruel and unusual punishment comprises several subparts.[28] With the exception of the constitutional challenges to the murder in the course of a felony aggravator and the allegedly inconsistent application of aggravating factors, each of the discrete constitutional challenges raised is procedurally barred because it was not raised on direct appeal. Moreover, each has been decided adversely to Elledge. See Proffitt v. Florida, 428 U.S. 242, 255-56, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (upholding constitutionality of Florida's death penalty statute against multiple challenges, including challenge based on vagueness and overbreadth of aggravating and mitigating circumstances and the lack of guidance for the jury in weighing such factors); Lugo v. State, 845 So.2d 74, 119 (Fla.2003) (reiterating that this Court has rejected the contention that the death penalty system is unconstitutional as being arbitrary and capricious because it fails to limit the class of persons eligible for the death penalty); Freeman v. State, 761 So.2d 1055, 1067 (Fla.2000) (rejecting as meritless the argument that the same felony underlying a felony murder conviction cannot be used as an aggravating factor); Fotopoulos v. State, 608 So.2d 784, 794 n. 7 (Fla.1992) (rejecting as meritless claim regarding the lack of an independent reweighing of aggravating and mitigating factors). Elledge also claims that execution by electrocution or lethal injection constitutes cruel and unusual punishment. This claim has been decided. See Elledge IV, 706 So.2d at 1342 *79 n. 4 & 1347 n. 9; see also, e.g., Sochor v. State, 883 So.2d 766, 789 (Fla.2004); Provenzano v. Moore, 744 So.2d 413, 415 (Fla. 1999).
Finally, Elledge's contention that the postconviction trial judge failed to conduct a proper cumulative review analysis fails. In denying Elledge's Brady claim pertaining to the State's purported failure to disclose a copy of the EEG report prepared by Dr. Norman, the trial court stated: "Based upon the evidence received at the hearing, and this Court's review of the record, the Defendant has failed to establish any Brady violation with regard to Dr. Norman's report." (Emphasis supplied). This statement undermines Elledge's contention that the trial court erred in not reviewing all of the evidence presented to determine the impact of the State's alleged failure to disclose the report. Moreover, this Court has determined that where individual claims are meritless, there is no cumulative effect to consider. See Johnson v. State, 769 So.2d 990, 1006 (Fla.2000) (holding that there is no cumulative effect where alleged errors are either procedurally barred or meritless).

Habeas Claim  Constitutionality of Florida's Death Penalty Statute
In his petition for writ of habeas corpus, Elledge presents several claims under the rubric of the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).[29] Each of Elledge's claims is meritless. See Johnson v. State, 30 Fla. L. Weekly S297 (Fla. Apr. 28, 2005). Elledge's contention with regard to the trial court's failure to provide a reasonable doubt instruction was decided adversely to him on direct appeal. See Elledge IV, 706 So.2d at 1347 n. 10.
With regard to the other constitutional challenges presented by Elledge, this Court has repeatedly rejected similar claims. See Proffitt, 428 U.S. at 255-56, 96 S.Ct. 2960 (upholding constitutionality of Florida's death penalty statute against multiple challenges, including challenge based on vagueness and overbreadth of aggravating and mitigating circumstances and the lack of guidance for the jury in weighing such factors); Griffin v. State, 866 So.2d 1, 14 (Fla.2003) (stating that this Court has repeatedly rejected claims that the standard jury instruction impermissibly shifts the burden to the defense to prove that death is not the appropriate sentence), cert. denied, ___ U.S. ___, 125 S.Ct. 413, 160 L.Ed.2d 328 (2004); Freeman, 761 So.2d at 1067 (rejecting contention that same felony underlying a felony murder conviction cannot be *80 used as an aggravating circumstance); Merck v. State, 664 So.2d 939, 943 (Fla. 1995) (rejecting overbreadth challenge to standard HAC instruction). Finally, this Court has rejected constitutional challenges to the State's failure to list aggravating factors in the indictment. See Brown v. Moore, 800 So.2d 223, 225 (Fla.2001) (rejecting constitutional challenge predicated on the failure to list aggravating factors in the indictment).

CONCLUSION
For the reasons stated herein, we affirm the trial court's order denying Elledge's 3.850 motion for postconviction relief and deny his petition for writ of habeas corpus.
It is so ordered.
PARIENTE, C.J., and WELLS, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, J., concurs specially with an opinion.
ANSTEAD, J., specially concurring.
I concur in the majority in all respects except for its discussion of the decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
NOTES
[1] The facts of the crimes against Strack are more fully explained in Elledge v. State, 346 So.2d 998, 999 (Fla.1977).
[2] Richardson v. State, 246 So.2d 771 (Fla. 1971).
[3] This Court determined that several other errors existed in Elledge's third penalty phase, including the admission of photos of the victim's corpse, the consideration of the rape of the murder victim as a prior violent felony, failure to find Elledge's abused childhood in mitigation, and the use of a nonstandard instruction on the "heinous, atrocious, or cruel" aggravating circumstance (HAC). See 613 So.2d at 436-37.
[4] The aggravating factors found were: (1) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person; (2) the capital felony was committed while the defendant was engaged in the commission of, attempt to commit, or escape after committing a rape; (3) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest; and (4) the capital felony was especially heinous, atrocious, or cruel. Elledge IV, 706 So.2d at 1342 n. 2.
[5] The nonstatutory mitigating factors found were: (1) the defendant had a difficult and abusive childhood; (2) the defendant demonstrated some cooperation by confessing after he was caught; and (3) the defendant was a friend and provider of support while incarcerated. Elledge IV, 706 So.2d at 1342 n. 3.
[6] These claims included: (1) the lack of funding to investigate postconviction claims violated Elledge's constitutional rights and the dictates of Spalding v. Dugger, 526 So.2d 71 (Fla.1988); (2) the State's withholding of public records denied Elledge his due process and equal protection rights; (3) Elledge was denied effective assistance of counsel at the penalty phase and during sentencing in violation of his Sixth, Eighth, and Fourteenth Amendment rights; (4) Florida law violates the constitution by shifting the burden of proof to the defendant to prove that death is inappropriate, and the trial judge used that presumption in rendering a sentence; (5) Elledge was denied his rights under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), when counsel failed to obtain an adequate mental health evaluation and failed to provide the necessary background information to the mental health experts; (6) the trial court erroneously instructed the jury regarding the standard for judging expert testimony; (7) Elledge is insane to be executed; (8) the rules prohibiting Elledge's postconviction counsel from interviewing jurors to determine if constitutional error was present during the penalty phase violated Elledge's constitutional rights; (9) trial counsel was ineffective for failing to declare a conflict of interest between himself and Elledge in violation of Elledge's constitutional rights; (10) Elledge was deprived of a fair trial due to excessive security measures and shackling; (11) execution of a death row inmate after twenty-three years on death row constitutes cruel and unusual punishment; (12) Elledge's lengthy confinement violates international law; (13) Florida's capital sentencing law is unconstitutional on its face and as applied because it fails to prevent the arbitrary and capricious imposition of the death penalty and violates the due process and cruel and unusual punishment clauses; and (14) the cumulative effect of the procedural and substantive errors during the trial court proceedings denied Elledge his right to a fair trial.
[7] Huff v. State, 622 So.2d 982 (Fla. 1993).
[8] The result of the MRI testing was normal, and the MRI is not the focus of Elledge's Brady claim.
[9] Elledge makes much of Ongley's testimony that he did not recall the State referring to a hyperventilation/photic stimulation EEG at Dr. Norman's deposition, and that if all he had heard was the term "EEG," he would not have known to ask for a report of a hyperventilation/photic stimulation EEG. Elledge's contention fails in the absence of any evidence establishing the existence of two EEG reports from Dr. Norman  one detailing the results of a "plain" EEG and a second detailing results of an EEG administered under conditions of hyperventilation and photic stimulation. The only EEG report in the record is that marked State's exhibit 14, which clearly states that the results of the EEG did not change under conditions of hyperventilation and photic stimulation.
[10] Postconviction counsel denied ever having seen State's exhibit 14. Postconviction counsel's ignorance of the report is of no moment with regard to the instant Brady analysis, which focuses on whether the State suppressed the report from discovery by Elledge's trial counsel. The State submitted the EEG and MRI reports constituting State's exhibit 14 to the trial court as documents exempt from public disclosure under Florida's public records statute. On September 1, 2000, the trial court issued an order stating that it had reviewed the documents submitted by the State and found no Brady violation or other information that would have been favorable to Elledge, and further stating that the records had been properly exempted.
[11] Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
[12] The trial court also informed her that neither of the mental health experts whom the defense presented had submitted reports that she could review.
[13] Dr. Lewis stated:

Then if I can still be of use, you know, but certainly I would schedule a time and, you know, try to review you again, try to review everything that is done. And possibly also, you know, meet with family members and, you know, and do a complete reevaluation. Really, because as I say, it's been over ten years.
[14] After completion of the November 15 phone call with Dr. Lewis, Elledge indicated that he would defer to her opinion that she could not testify without the information she requested, and released her as an expert.
[15] This included no fewer than five doctors who had examined Elledge fairly close in time to the murder, including Dr. Miller, a psychiatrist appointed to examine Elledge in 1974 who found no evidence of seizures and concluded that he suffered from a major personality disorder; Dr. Taubel, another psychiatrist appointed to examine Elledge who also diagnosed him with an antisocial personality disorder; Dr. Eickert, who met with Elledge along with Dr. Taubel and determined that Elledge was not psychotic at the time of the meeting or in the past; Dr. Powell, a psychiatrist with the California Youth Authority who evaluated Elledge in his late teens after he was detained for assaulting a nine-year-old girl and determined that there was no evidence of psychosis or organic brain disease and that Elledge had an antisocial personality disorder; and Dr. Stapen with the Colorado State Hospital system who diagnosed Elledge with an antisocial personality disorder.
[16] This case, referred to in the proceeding below as the Shawcross case, involved a defendant who admitted fabricating the multiple personalities Dr. Lewis had diagnosed. During the evidentiary hearing, Dr. Lewis testified that she had reached her conclusion based on hypnosis and had warned Shawcross's attorneys of the questionable value of hypnotic testimony. According to Dr. Lewis, she suffered the ire of the people of Rochester and the jury, and ultimately discovered that no local psychologists would work for the defense in that matter. She also testified to believing that her phones had been tapped during the course of the proceeding. Trial counsel Laswell testified during the evidentiary hearing that he was concerned about using Dr. Lewis as a witness because her work on the Shawcross case had brought her into wide professional disrepute, and that he had mentioned those concerns directly to Elledge.
[17] Elledge makes much of the fact that both experts agreed that he had elements of antisocial personality disorder  conclusions that essentially aligned with the State's mental health expert who opined that Elledge had an antisocial personality disorder. However, a review of the 1993 penalty phase transcript reveals that the opinions of the defense witnesses were nuanced and did not simply reflect the State's position. Each witness was cross examined with evidence regarding the findings of numerous other professionals who had diagnosed Elledge with an antisocial personality disorder both prior to and soon after the murder of Margaret Strack. See supra note 15. In the face of such evidence, it would have damaged the credibility of the defense experts not to acknowledge that Elledge had characteristics of this disorder if true. However, both experts attempted to place that aspect of Elledge's personality into a larger context that weighed in mitigation. Dr. Schwartz testified that in addition to characteristics of antisocial personality disorder, Elledge displayed signs of organic brain damage, fetal alcohol syndrome, post traumatic stress disorder, and polysubstance abuse, all of which impacted his ability to process information and temper his impulses. Dr. Caddy conceded that Elledge had a mixed personality disorder where the principal ingredient was sociopathy. However, Dr. Caddy testified that the relevant inquiry was not that Elledge had an antisocial personality disorder, but why he had it, and how the factors that formed that aspect of his personality impacted the events culminating in the Strack murder.
[18] Although the current posture of this case does not require this Court to review the substance of the 1993 sentencing order, our review of the transcript occasioning the instant claims leads us to conclude that the extent of the conflict between the experts may have been somewhat overstated. On the subject of organic brain damage, Dr. Caddy did not rule out the existence of brain damage, but indicated that he did not believe any such damage would have been relevant to account for the murder of Strack. Moreover, Dr. Caddy stated that he based his evaluation of Elledge largely on clinical interviews and that the few tests he did administer were not designed to reveal the existence of organic brain damage. With regard to fetal alcohol syndrome, Dr. Caddy indicated that he considered it, and found a few indicators in support of the theory, but ultimately rejected it. Finally, Dr. Caddy indicated that Elledge's underlying mental illness was an ultimate part of the stress he endured for his first fifteen or sixteen years of life, but that Dr. Caddy did not determine that it constituted post-traumatic stress disorder.
[19] Spencer v. State, 615 So.2d 688 (Fla.1993) (requiring trial judges in capital cases to hold a hearing prior to rendering a sentence to give the defendant, his counsel, and the State opportunity to be heard; to afford, if appropriate, both State and defendant opportunity to present additional evidence; to allow both sides to comment on or rebut information in any presentence or medical report; and to afford defendant opportunity to be heard in person).
[20] It bears noting that Laswell presented twenty-one witnesses altogether during the 1993 penalty phase, including Elledge's aunt, sister, and brother, two mental health experts, two experts in future dangers, six prison guards, one of Elledge's fellow death row inmates, a clergyman, one of Elledge's pen pals, a postconviction expert, Elledge's wife and stepdaughter at the time of the 1993 penalty phase, and Elledge's girlfriend at the time of the crime.
[21] Indeed, the trial court explained that it had decided to forego shackling Elledge, even though the counsel tables were fully covered, and that Elledge was appreciative of that fact and acknowledged and was aware that the court would provide security.
[22] The State sought and was granted only a fifteen-day extension of time to file its response to the amended motion due to the assistant deputy attorney general's involvement in other cases which had generated active death warrants around the time which was the filing deadline in Elledge's case.
[23] Huff v. State, 622 So.2d 982 (Fla.1993).
[24] These claims include: (1) Elledge's lengthy confinement violates international law; (2) the trial judge erroneously instructed the jury on the standard for judging expert testimony resulting in the jury making decisions of law; (3) Elledge is insane to be executed; (4) the rule prohibiting Elledge's lawyers from interviewing jurors to ascertain if constitutional error was present is unconstitutional; (5) Elledge is innocent of the death penalty; (6) Florida's capital sentencing statute is unconstitutional because it fails to prevent the arbitrary and capricious imposition of the death penalty and violated the due process guarantees against cruel and unusual punishment; (7) Florida's death penalty statute permits cruel and unusual punishment; and (8) the trial court erred in failing to conduct a cumulative review analysis.
[25] Elledge's claim that he is insane to be executed was presented to preserve future state and federal review and will not be addressed by this Court.
[26] The related assertion that the prosecutor rendered improper comment on the witnesses' credibility similarly fails.
[27] Likewise, any substantive claim pertaining to juror misconduct is procedurally barred as it could have and should have been raised on direct appeal.
[28] Elledge contends: Florida's capital sentencing statute fails to provide a necessary standard for determining that aggravating circumstances "outweigh" mitigating factors, does not define "sufficient aggravating circumstances," and does not sufficiently define each of the aggravating circumstances; Florida's capital sentencing procedure does not have the independent reweighing of aggravating and mitigating circumstances required by Proffitt v. Florida, 428 U.S. 242, 255-56, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); the aggravating circumstances have been applied in a vague and inconsistent manner and juries have received unconstitutionally vague instructions; and that Florida law violates the Eighth Amendment in creating a presumption of death if a single aggravating circumstance is found, which occurs in every case of felony murder and nearly every premeditated murder. Elledge repeats his claims regarding the lack of a standard for weighing aggravators and mitigators and the unconstitutionality of the murder in the course of a felony aggravator in his petition for habeas relief.
[29] Elledge states his claim in several subparts. First, Elledge claims that Florida's capital sentencing scheme violates the Sixth and Fourteenth Amendments because the jury's advisory sentence is not supported by facts; the statute does not require a unanimous vote on the existence of aggravating circumstances or the recommendation of death; and the jury is not instructed as to the reasonable doubt standard for two of the three elements required to render him death-eligible  that sufficient aggravating circumstances exist and that mitigating circumstances do not outweigh the aggravating circumstances. Second, Elledge claims that the instructions regarding the heinous, atrocious and cruel aggravating circumstance are unconstitutionally overbroad, and, as a result, Elledge's jury should have been required to make unanimous, specific findings as to the aggravating circumstances and that the jury instructions shift the burden of proof to the defendant to prove that mitigating circumstances outweigh the aggravating circumstances. Third, Elledge argues that the State's failure to notify Elledge in the indictment of the aggravating factors it would seek violated his rights under article I, section 15 of the Florida Constitution as well as the Sixth Amendment to the United States Constitution.